*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 17**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

PERCY L. WILDER,
*Petitioner.*

No. 20160952
Filed May 15, 2018

On Writ of Certiorari to the Utah Court of Appeals

Second District, Ogden
The Honorable Mark R. DeCaria
No. 131900362

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Solic. Gen., Salt Lake City, for respondent

Samuel P. Newton, Kalispell, MT, for petitioner

JUSTICE HIMONAS authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1    While on parole from the state prison for the attempted rape of a child, defendant, Percy Wilder, detained and sexually attacked the victim, leading a jury to convict him of one count of aggravated sexual assault and one count of aggravated kidnapping. Before the court of appeals, Mr. Wilder argued that these two convictions should have merged pursuant to *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243. He also argued that his trial counsel was ineffective for not asking for an order to that effect.

¶2 The court of appeals disagreed. It reasoned that Mr. Wilder's trial counsel didn't render ineffective assistance because the convictions didn't, in fact, merge. We granted a writ of certiorari to determine whether the court of appeals erred in its determination. It didn't.

¶3 The State and Mr. Wilder share no common ground with respect to the decision of the court of appeals other than in one significant particular: both ask us to repudiate the common-law merger test we first announced in *Finlayson* and recapped in *State v. Lee*, 2006 UT 5, 128 P.3d 1179, (*Finlayson-Lee* test). We accept the invitation, overrule the relevant portions of *Finlayson* and *Lee,* and announce that the controlling test is set forth in Utah Code section 76-1-402(1). In view of this decision, we uphold the determination of the court of appeals that Mr. Wilder's trial counsel wasn't ineffective.

## BACKGROUND

¶4 After going to a concert at an Ogden nightclub, and not yet ready to call it a night, the victim and her friend decided to go to a house party.[1] The two women got to the party at around 1:30 a.m. Mr. Wilder showed up a few minutes later. In short order, he started hassling the victim to go outside with him to talk. The victim told him no. Undeterred, Mr. Wilder repeated his invitation nearly a dozen times. The answer was always no.

¶5 While the victim didn't go outside with Mr. Wilder, she did decide to step outside to retrieve her phone from her car. Mr. Wilder followed her out the door and immediately relaunched his verbal offensive—now asking her over and over again to "go with him" to talk. Again, the answer was no. Mr. Wilder didn't stop. He opened the driver's side door of his car and tried to get the victim to sit down. At first, she kept telling him that she didn't want to. Ultimately, however, she gave in hoping that it would "get him to shut up."

¶6 But Mr. Wilder kept going. Once he got the victim in the car, he tried to get her to scoot over to the passenger seat. When she refused, he sat on the edge of the driver's seat. She then crossed over

---

[1] On review of a jury verdict, we recite the evidence, and all the reasonable inferences that flow from the evidence, in the light most favorable to the verdict. *State v. Griffin*, 2016 UT 33, ¶ 2 n.2, 384 P.3d 186.

to the passenger's side, opened the door, and put one of her legs out. To prevent the victim from getting out, Mr. Wilder started the car, quickly backed up, and said he wanted her "to ride with him to go pick up a friend and take him home or something." The victim's door was still open as the car began moving forward.

¶7 Afraid Mr. Wilder would run over her if she jumped out, the victim closed the car door, but asked Mr. Wilder to stop at her car on the partial pretext of wanting to grab her phone. Really, she just wanted out. Mr. Wilder refused. Instead, he kept driving, now going on about wanting to have oral sex. The victim kept saying no.

¶8 Mr. Wilder, it appears, couldn't have cared less about obtaining the victim's consent. So, he drove for a couple of minutes and then pulled up by a dumpster toward the back of a parking lot adjacent to an apartment complex. There, he turned the car off and asked the victim to undress. He then tried to put his hand up her shirt, shoved his head into her chest, and bit her. When she still refused to submit, he started screaming at her "[t]o get naked." The victim reacted by asking why he was doing this and telling him if he'd let her out she'd walk home. Mr. Wilder then shouted that he'd cut her if she got out of the car.

¶9 Despite Mr. Wilder's threat to cut her, the victim continued to say no and to ask him why he was doing this. She also told him that she had children at home. Mr. Wilder answered that "he didn't give an 'F' about [her] or [her] kids, and that [she] was going to do what he said."

¶10 Around this time, the victim took her heels off with an eye toward making a run for it. Mr. Wilder told her to keep getting undressed. When she wouldn't, he "reached down the side of his car and said, 'I'm going to count to three, and if you are not naked, I'm going to gut you from head to toe.'"

¶11 At two, the victim opened the door, jumped out, pulled away from Mr. Wilder, and started running for the apartment complex. The victim was in the car with Mr. Wilder for some ten minutes before she was able to make her escape.

¶12 The victim made it inside of the apartment complex and, hearing Mr. Wilder running behind her, started pounding on doors and screaming. Mr. Wilder caught up with the victim, wrapped his hand in her hair, and began trying to drag her back to the car. She fought back by dropping close to the ground and locking her arms and legs in a way that, given the narrow hallway, kept Mr. Wilder from being able to drag her back. Mr. Wilder then released the

victim, punched her in the face, and ran off. The victim continued pounding on apartment doors and screaming until she was able to attract help and call 911. Police were able to quickly find and arrest Mr. Wilder.

¶13 The State charged Mr. Wilder with one count of aggravated sexual assault, a first-degree felony, and one count of aggravated kidnapping, also a first-degree felony. The jury found Mr. Wilder guilty as charged. The trial judge sentenced Mr. Wilder to two terms of fifteen years to life, to run concurrently with each other but consecutive to Mr. Wilder's prison sentence for his prior conviction for attempted rape of a child. At no point during the trial proceedings did Mr. Wilder's trial counsel move to have the two convictions merged.

¶14 We granted a writ of certiorari on the question of "[w]hether the court of appeals erred in concluding [Mr. Wilder's] trial counsel could not have established that his aggravated kidnapping and aggravated sexual assault charges merged." We assert jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶15 "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard[s] of review used by the court of appeals. We conduct that review for correctness, ceding no deference to the court of appeals." *Judge v. Saltz Plastic Surgery, P.C.*, 2016 UT 7, ¶ 11, 367 P.3d 1006 (alteration in original) (citation omitted). In addition, the underlying merger issue asks a question of law, which we also review for correctness. *See State v. Diaz*, 2002 UT App 288, ¶ 10, 55 P.3d 1131.

## ANALYSIS

¶16 Mr. Wilder's overarching contention is that his trial "counsel ineffectively failed to move to merge [his] aggravated kidnapping conviction with his aggravated sexual assault conviction." Specifically, Mr. Wilder argues that his trial counsel was ineffective because counsel failed to seek merger of the two convictions under (a) the *Finlayson-Lee* test[2] or (b) the statutory test set forth at Utah

---

[2] Under the *Finlayson-Lee* test, if it's alleged that an individual is taken or confined "to facilitate the commission of another crime, to be kidnap[p]ing the resulting movement or confinement:

Code section 76-1-402(1).[3] In the back-and-forth of these arguments, both Mr. Wilder and the State assert that the *Finlayson-Lee* test is a legal mess that must be overturned. Mr. Wilder would have us replace the *Finlayson-Lee* test with another common-law test, which he refers to as a "modified-*Kimbel* test."[4] The State would have us eschew any common-law test in favor of the statutory test and hold that because the *Finlayson-Lee* test is invalid, Mr. Wilder's counsel's failure to invoke it cannot serve as the basis for an ineffective assistance claim. And the statutory merger test likewise cannot serve as the basis, according to the State, because Mr. Wilder failed to advance this argument before the court of appeals. We agree with both of the State's contentions.

I

¶17 "The Sixth Amendment to the United States Constitution guarantees a criminal defendant the [a]ssistance of counsel for his defense, meaning that he has the right to effective assistance of counsel." *State v. Bond*, 2015 UT 88, ¶ 59, 361 P.3d 104 (alteration in original) (citation omitted) (internal quotation marks omitted). "Under the Supreme Court's decision in *Strickland v. Washington*, [a defendant] must satisfy a two-part test to demonstrate" that he's been deprived of counsel's effective assistance. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). First, he must demonstrate "his counsel rendered a deficient performance in some demonstrable

---

> (a) Must not be slight, inconsequential and merely incidental to the other crime;
> (b) Must not be of the kind inherent in the nature of the other crime; and
> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection."

*State v. Finlayson*, 2000 UT 10, ¶ 23, 994 P.2d 1243 (citation omitted); *see also State v. Lee*, 2006 UT 5, ¶ 27, 128 P.3d 1179.

[3] Section 76-1-402(1) provides that "when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision."

[4] *See generally State v. Kimbel*, 620 P.2d 515 (Utah 1980).

manner, which performance fell below an objective standard of reasonable professional judgment." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 (citation omitted). Second, he must establish "counsel's performance prejudiced" him, *id.* (citation omitted), meaning there's "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* ¶ 40 (citation omitted).

¶18 We needn't look beyond the second aspect of the *Strickland* test—the prejudice prong—to conclude that Mr. Wilder's trial counsel didn't render ineffective assistance by not arguing for merger under the *Finlayson-Lee* test. As a matter of law, counsel cannot be ineffective for failing to raise and rely on bad law. *See Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993) ("To hold otherwise would grant criminal defendants a windfall to which they are not entitled."); *Grullon v. United States*, No. 92 Civ. 3956 (RWS), 1992 WL 276827, at *4 (S.D.N.Y. Sept. 25, 1992) ("The failure of Grullon's counsel to raise a claim on bad law certainly would not have resulted in a different outcome of the trial in Grullon's favor."). And for the reasons we explain in the next section, the *Finlayson-Lee* test is bad law.

II

¶19 "*Stare decisis* is a cornerstone of Anglo-American jurisprudence . . . ." *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 57, ___P.3d___ (citation omitted) (internal quotation marks omitted). Without it there would be no meaningful "rule of law." Instead, judges could toss aside precedent as casually as a losing lotto ticket. By fencing judicial discretion, *stare decisis* improves predictability, leads to fairer outcomes, and promotes public confidence in the judiciary. Accordingly, we "don't overrule our precedents unless they've proven to be unpersuasive and unworkable, create more harm than good, and haven't created reliance interests." *Id.* This is an intentionally high bar. But we're persuaded that, with respect to the repudiation of the *Finlayson-Lee* test, it's been cleared.

¶20 The *Finlayson-Lee* test is unpersuasive: "[I]n determining how much deference" we should afford to precedent, we must first consider "the persuasiveness of the authority and reasoning on which the precedent is based." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 24, 345 P.3d 553. Here, we're convinced that the *Finlayson-Lee* test is based on precedents that sit on cracked legal footings.

¶21 The *Finlayson-Lee* test is a common-law merger test that has its "most common application . . . in cases involving sexual assault and kidnapping." *Met v. State*, 2016 UT 51, ¶ 129, 388 P.3d 447 (Lee, A.C.J., concurring in part and concurring in the judgment).[5] And, "'[absent] a clear distinction' between sexual assault and kidnapping, we have warned that 'virtually every rape . . . would automatically be a kidnap[p]ing as well.'" *Id.* (quoting *State v. Finlayson*, 2000 UT 10, ¶ 19, 994 P.2d 1243) (second and third alterations in original). We've also "suggested that a conviction for both crimes may raise double jeopardy concerns—by imposing 'double punishment for essentially the same act.'" *Id.* (quoting *Finlayson*, 2000 UT 10, ¶ 19); *see also State v. Lee*, 2006 UT 5, ¶ 31, 128 P.3d 1179 (intimating that "a criminal defendant could be punished twice for conduct that amounts to only one offense, a result contrary to protections against double jeopardy").

¶22 There are two glaring problems with the reasoning of *Finlayson* and *Lee*. First, neither remotely addressed the fact that "the legislature has enacted a statute dictating the terms and conditions of merger of criminal offenses" in this context. *Met*, 2016 UT 51, ¶ 131 (Lee, A.C.J., concurring in part and concurring in the judgment); *see also* UTAH CODE § 76-1-402(1). And we "cannot see how [absent the existence of a constitutional ground] we can exercise common-law power in the face of . . . a statute regulating the enterprise of merger in this field." *Met*, 2016 UT 51, ¶¶ 131–32 (Lee, A.C.J., concurring in part and concurring in the judgment).[6] Our role is to interpret statutes, not to effectively supplant them.

---

[5] We rely on and quote extensively from Associate Chief Justice Lee's thoughtful concurring opinion in *Met*, 2016 UT 51. And we note that the majority's reasoning for not endorsing the Associate Chief Justice's approach in *Met* in the first instance had nothing to do with the substance of his analysis; rather, it was based on the conclusion that *Met* was not a procedurally "appropriate case" for us to conclusively decide the continued viability of the *Finlayson-Lee* test because, unlike here, the parties had not asked us to revisit the issue, leaving it unbriefed. *Id.* ¶ 104 n.25.

[6] Section 76-1-402 contains two merger tests. The first, located in subsection (1), is the test the State advocates for today; the second, found in subsection (3), addresses included offenses—predominantly lesser-included offenses—and isn't in play in this

¶23 Second, there's no constitutional basis for exercising common-law power as the double jeopardy concern is unfounded. We're again persuaded by Associate Chief Justice Lee's work in *Met*:

> The double jeopardy provisions of both the United States and Utah Constitutions protect only against double jeopardy for the "same offense." U.S. CONST. amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); UTAH CONST. art. [I], § 12 ("nor shall any person be twice put in jeopardy for the same offense"). And both provisions have long been understood to operate at the *offense* level—as a protection against multiple punishments or serial prosecution of the same criminal offense.

*Id.* ¶ 132 (citing *Blockburger v. United States*, 284 U.S. 299 (1932), and *State v. Sosa*, 598 P.2d 342 (Utah 1979)).

¶24 Thus, there's "no double jeopardy problem even where both crimes arise out of the exact same set of facts" so long as the crimes have "distinct elements." *Id.* ¶ 133 (citing *Blockburger*, 284 U.S. at 304; *Sosa*, 598 P.2d at 346). And, there's no question that aggravated sexual assault and aggravated kidnapping have distinct elements. *Compare* UTAH CODE § 76-5-302, *with* UTAH CODE § 76-5-405.

¶25 In short, the legislature enacted a statutory merger test that speaks directly to the question presented by *Finlayson*, *Lee*, and this matter. Yet, this court jumped over that test in *Finlayson* and adopted a common-law merger test, and then doubled down on that common-law version in *Lee*. And the only constitutional justification hinted at in these decisions for doing so—double jeopardy—doesn't apply.[7] With these observations in mind, we cannot but severely question the persuasive value of the *Finlayson-Lee* test.

---

matter. The opinion in *Lee* addressed the applicability of only the second statutory merger test. 2006 UT 5, ¶¶ 28–35.

[7] Defendant suggests that there are several other constitutional grounds we could look to that would allow us to frame a common-law merger test, including the cruel and unusual punishment and equal protection clauses of the United States Constitution and the unnecessary rigor and uniform operation of law clauses of the Utah

¶26 The *Finlayson-Lee* test is unworkable and creates more harm than good: Whether the precedent is unpersuasive is certainly a significant consideration in determining whether it should be overruled, but it's not the be-all and end-all of our *stare decisis* analysis. Other important considerations include its workability, i.e., how well it's "worked in practice," and whether it's generated more harm than good. *Eldridge*, 2015 UT 21, ¶¶ 40, 60.

¶27 Here, *both* the State and Mr. Wilder decry the unworkability of the *Finlayson-Lee* test. In Mr. Wilder's words: "Both parties agree that the *Finlayson-Lee* test works poorly and, as the State puts it, is 'unpredictable and confusing.'" Such a uniform view amongst the parties is a unique and powerful tell: damning evidence of how poorly the test has worked and of the negligible benefit, if any, it's generated.

¶28 And we echo the concerns expressed by the parties as to the workability of the *Finlayson-Lee* test. As we noted in *Met*, it's not even "immediately apparent how" (if even possible) to square the outcome in *Finlayson* with the outcome in *Lee* in a principled way. *Met*, 2016 UT 51, ¶ 104 n.25 ("It is not immediately apparent how to distinguish the detention in *Finlayson*—which we found to have no independent significance—from the detention in *Lee*—which we concluded supported a separate kidnapping conviction.").

¶29 Our court of appeals has also expressed concerns with the test's workability. In *State v. Kataria*, Judge Voros, joined by then Judge Pearce, fairly criticized the third factor as being internally inconsistent, as well as inconsistent with *Finlayson*:[8]

> A crime whose significance lies in making the host crime easier to commit or get away with would seem to be dependent on, not independent of, the host crime. Because we cannot square this clause with . . . *Finlayson*

---

Constitution. We have considered each of these justifications and summarily reject them.

[8] The third factor, recall, provides that the "resulting movement or confinement . . . [m]ust have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." *Finlayson*, 2000 UT 10, ¶ 23 (quoting *State v. Buggs*, 547 P.2d 720, 731 (Kan. 1976)).

> . . . or even the first half of the third . . . factor, we do
> not accord it controlling weight.

2014 UT App 236, ¶ 34 n.10, 336 P.3d 1093 (Voros, J., concurring in part and writing for the majority in part).

¶30 The nature and logic of the criticisms of the workability of the *Finlayson-Lee* test also lead us to conclude inexorably that it's created more harm than good. Accordingly, this factor, like the persuasiveness factor, balances heavily against perpetuating the test. This leaves us with the reliance inquiry.

¶31 <u>No legitimate reliance interests are at stake</u>: This factor concerns itself with "the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Eldridge*, 2015 UT 21, ¶ 35. An often closely connected inquiry is "how firmly a precedent has established itself in Utah law." *Id.* ¶ 34.

¶32 True, facts that normally might tend to indicate well-established precedent—the *Finlayson-Lee* test has been in place for seventeen years and the subject of much litigation—are present here. But what legitimate reliance interests, if any, could we possibly undercut by abrogating the *Finlayson-Lee* test? It seems quite unlikely that defendants would have committed their crimes differently under a different test. It's also illegitimate to suggest that because past charging decisions or trials may have been infected by the *Finlayson-Lee* test, future charging decisions and trials should be similarly infected. And absent our ability to discern some meaningful prejudice that the public may suffer if we repudiate the test—reliance that we have yet to identify—this factor doesn't outweigh the important concerns we've addressed above.

¶33 With this analysis firmly in mind, we overrule the relevant portions of *Finlayson* and *Lee* and disavow the *Finlayson-Lee* test.

¶34 A note of caution, however, is in order. We've not gone through the process of determining whether this matter would have come out differently if we didn't abandon the *Finlayson-Lee* test. In other words, we didn't gauge whether Mr. Wilder would lose even if we were to apply the test here. This process, which would potentially allow us to avoid reaching the viability of *Finlayson* and *Lee* unless we had to—represents our more usual approach. *See State v. Rowan*, 2017 UT 88, ¶ 24, ___P.3d___ (Himonas, J., concurring) ("As a general rule, our court declines to revisit established

precedent unnecessarily.").[9] But this case presents the sort of compelling constellation of factors where we conclude that our more customary approach to *stare decisis* should give way to the development of the law. *Rowan*, 2017 UT 88, ¶ 36 (Lee, A.C.J., concurring) ("[A]ppellate courts retain the discretion to reach alternative grounds for decision."). First, the *Finlayson-Lee* test rests on truly shaky legal ground. Second, both parties, as well as the courts, are highly critical of how the test works in practice. Third, there are no meaningful reliance interests at stake that we've been able to identify. And last, and as we've noted above and set forth below, there already exists a statutory version of the test in Utah Code section 76-1-402(1).

## III

¶35 On the second-to-last page of his opening brief, Mr. Wilder fleetingly argues that his trial counsel was ineffective for failing to seek merger pursuant to Utah Code section 76-1-402(1). Again, that section provides that "when the *same act* of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision." UTAH CODE § 76-1-402(1) (emphasis added.) And per Mr. Wilder, his "sexual assault[,] with its associated detention to continue the assault," was the same act.

¶36 Maybe Mr. Wilder is right, maybe he's not. The problem is he didn't raise this issue before the court of appeals or in his petition for certiorari and, therefore, has waived his ability to raise it before this court on certiorari review. *See, e.g.*, *Hansen v. Eyre*, 2005 UT 29,

---

[9] The concurrence mistakenly contends that we are "announc[ing] a 'general rule' of avoidance" in this opinion, thereby suggesting we are breaking new ground. *Infra* ¶ 40. But there is nothing new in our opinion about our approach to *stare decisis* or our characterization of that approach. Indeed, the "general rule" language that the concurrence takes issue with is part of a quotation from a previous decision—*Rowan*—where a majority of this court summarized our conventional approach to *stare decisis*. 2017 UT 88, ¶ 24 (Himonas, J., concurring) (joined by a majority of the court); *see also Donawitz v. Danek*, 366 N.E.2d 253, 256 (N.Y. 1977) ("[S]tare decisis dictates that we refrain from *unnecessarily reaching out* to overrule" precedent. (emphases added)).

¶ 7 n.3, 116 P.3d 290 ("[Appellant's] other arguments are not properly before this court because they were neither included in his petition for certiorari nor decided by the court of appeals.").

¶37 We recognize that our disposition of this issue, as well as today's opinion writ large, leaves several questions unanswered, including the meaning of the "same act" language of the statutory merger test. We take a measure of solace, however, in our observation that, given the frequency with which merger issues arise, we'll have an opportunity to opine again on this subject in the not too distant future.

## CONCLUSION

¶38 We renounce the common-law merger test, which we first set forth in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, and recapped in *State v. Lee*, 2006 UT 5, 128 P.3d 1179, and hold that the controlling test is the statutory standard set forth in Utah Code section 76-1-402(1). As a result, Mr. Wilder's counsel wasn't ineffective for failing to seek merger of his aggravated sexual assault and aggravated kidnapping convictions pursuant to *Finlayson*. And because Mr. Wilder didn't argue to the court of appeals that his counsel was ineffective for failing to argue for statutory merger, that argument is waived. For these reasons, we uphold the judgment of the court of appeals affirming Mr. Wilder's aggravated sexual assault and aggravated kidnapping convictions.

––––––––––

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶39 I agree with and concur in the judgment of the court and in most everything in the majority opinion—including the grounds identified by the majority for overruling the "common law merger" standard set forth in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, and *State v. Lee*, 2006 UT 5, 128 P.3d 1179. As I've noted previously, I find these precedents both problematic and ripe for reconsideration. *See Met v. State*, 2016 UT 51, ¶¶ 131–32, 388 P.3d 447 (Lee, A.C.J., concurring in part and concurring in the judgment). And I agree with the grounds identified by the majority for setting them aside.

¶40 I write separately, however, to note my disagreement with the majority's statement of our court's "usual approach" to dealing with problematic precedent. *Supra* ¶ 34. Unlike the majority I would not announce a "general rule" of avoidance—of "avoid[ing] reaching" the question of the viability of a problematic line of cases "unless we ha[ve] to" do so. *Supra* ¶ 34 (citing *State v. Rowan*, 2017

UT 88, ¶ 24, __ P.3d __ (Himonas, J., concurring)). And I would not advocate a presumption in favor of an analysis of "whether th[e] matter would have come out differently if we didn't abandon" the problematic precedent. *Supra* ¶ 34.

¶41 In my view the majority's "usual approach" is not often a path of restraint or avoidance. It is a reinforcement of the line of cases that we are applying. And if we have reason to doubt the viability of that precedent then I think we should generally reevaluate it.

¶42 My thinking on this point is set forth in my separate opinion in *Winward v. State*, 2012 UT 85, 293 P.3d 259 (Lee, J., concurring in the judgment), where a similar question arose. I write here only to restate and extend what I said in *Winward*, and to explain why the majority's "usual approach" strikes me as problematic as applied to a case like this one.[10]

¶43 In *Winward* I noted that it is not logically possible for us to apply a law "without describing its content." 2012 UT 85, ¶ 43. I also explained that we cannot describe the content of an ill-defined legal standard (like that at issue here) "without articulating its basis in law." *Id.* And I emphasized, finally, that any decision stating and applying a standard from our cases is a reinforcement of that standard. *Id.* ¶ 54.

¶44 These observations are appropriate here. One shortcoming (of many) of the *Finlayson-Lee* test is that it does not lend itself to principled application. *See supra* ¶¶ 26–30. For that reason we cannot apply the test here without expanding on it and clarifying it. And in order to do that we have to consider the legal basis for—and thus the viability of—the standard we prescribed in these cases.

¶45 There is no middle course of avoidance in a case like this one. We cannot apply the *Finlayson-Lee* test assuming *arguendo* that it is the law. To do so is to reinforce the viability of the test. And that is

---

[10] The majority does not in fact follow the path it paints as typical. It takes a contrary course, identifying a "compelling constellation of factors" that sustains an exception to the general rule. *Supra* ¶ 34. For that reason my disagreement is a narrow one. I agree with the path the court takes; I just see the court's exception as more the general rule, for reasons explained below.

not a matter of restraint or avoidance. *See Winward*, 2012 UT 85, ¶ 54 (noting that we are not *avoiding* the question of the viability of a questionable legal standard when we apply it to the disposition of a case; asserting that the "application" of a questionable legal principle "is in no way an act of avoidance").

¶46 In my view these are the reasons for reconsidering the test set forth in *Finlayson* and *Lee*. When we are convinced that a line of precedent is of dubious viability and difficult to apply without further clarification, it seems to me that we have a duty to return to first principles. In such circumstances, our "usual approach," *supra* ¶ 34, should not be to reinforce a problematic precedent by assuming its viability for the sake of argument. We should instead reconsider the basis for that precedent—as we do here. I concur on the understanding that the approach we follow here is in line with these premises.

---