2024 UT App 5

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TANIELA SALAKIELU,
Appellant.

Opinion
No. 20220886-CA
Filed January 11, 2024

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 211904984

Sarah J. Carlquist, Attorney for Appellant

Sean D. Reyes and Connor Nelson,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Taniela Salakielu was involved in a prison riot. Following the riot, Salakielu was charged with aggravated kidnapping and riot. After considering evidence at a preliminary hearing, the district court bound Salakielu over for trial as charged. Thereafter, Salakielu moved to quash the bindover on the aggravated kidnapping charge, which motion the court denied. Salakielu now appeals the court's interlocutory order denying his motion to quash. For the reasons set forth herein, we agree with Salakielu that the district court exceeded its discretion in denying the motion and accordingly reverse the court's order and remand the matter with instruction to grant Salakielu's motion to quash the bindover on the aggravated kidnapping charge.

BACKGROUND[1]

¶2      Salakielu is an inmate at the Utah State Prison. In November 2020, two corrections officers at the prison smelled a "strong aroma of alcohol" emanating from a cell assigned to Salakielu and his cellmate (Cellmate). The officers entered the empty cell and began conducting a search. During the search, the officers discovered a bag of fermenting fruit as well as electronics that did not belong to either Salakielu or Cellmate. The officers attempted to confiscate the electronics. When Salakielu and Cellmate noticed what the officers were doing, Cellmate began to threaten the officers. Salakielu, who was standing in the corridor outside of the cell, removed his shower shoes and put on tennis shoes.

¶3      The interaction between the officers and Salakielu and Cellmate caught the attention of another inmate (Inmate) who stepped in and tried to prevent Salakielu and Cellmate from entering their cell. Inmate stood near the entry to Salakielu and Cellmate's cell, between the officers and Salakielu and Cellmate. Inmate tried to "negotiate" with the officers to leave the electronics in the cell. When the officers refused, Inmate shut the cell door, locking the officers inside.

---

1. "Because this case comes to us on an interlocutory appeal, the allegations we recite have not been tried and therefore remain allegations. On interlocutory review, we recount the facts as alleged and in a light most favorable to the ruling below." *State v. Stewart*, 2018 UT 24, ¶ 2 n.1, 438 P.3d 515 (quotation simplified); *see also State v. Glosenger*, 2022 UT App 129, n.2, 521 P.3d 915 ("When we review a magistrate's bindover decision, we view all evidence in the light most favorable to the prosecution, draw all reasonable inferences in favor of the prosecution, and recite the facts with that standard in mind." (quotation simplified)), *cert. denied*, 525 P.3d 1267 (Utah 2023).

¶4     Thereafter, all inmates in the cellblock were instructed to "rack in," meaning to close themselves inside their cells. Salakielu, Cellmate, and a few other inmates disregarded the order. Surveillance video of the cellblock shows Cellmate throwing metal boxes at the cell holding the officers, as well as Salakielu pouring shampoo or conditioner in front of a door leading from the cellblock into the yard. And surveillance video of the dayroom, which can be accessed from the main corridor of the cellblock, shows Inmate tying a bed sheet across the door leading into the dayroom.

¶5     After approximately an hour from the time they were first instructed to rack in, Salakielu and Cellmate followed the instruction and closed themselves inside an empty cell. But once inside the cell, Salakielu and Cellmate lit a bed sheet on fire and pushed it into the hallway.[2]

¶6     After all inmates—including Salakielu and Cellmate—were racked in, prison officers with the Critical Incident Response Team (CIRT) entered the cellblock. The CIRT officers extinguished the fire and let the officers out of the cell. At that point, the officers had been locked inside the cell for approximately one hour. Shortly thereafter, an investigator (Investigator) arrived on the scene. He examined the scene and interviewed the officers who had been locked in the cell, as well as some of the other inmates who had been involved in the riot.

¶7     The State charged Salakielu with one count of riot and one count of aggravated kidnapping. During the preliminary hearing on the matter, the State submitted statements from the officers, testimony from Investigator, and surveillance video of the cellblock. After reviewing the surveillance video, Investigator

---

2. It is unclear from the surveillance video whether Salakielu or Cellmate lit the bed sheet on fire, and both have, at varying times, claimed responsibility for doing so.

explained that based on his experience, it is "common" for inmates to "lace up"—meaning to change from shower shoes to tennis shoes—when they are "preparing to get ready to fight." Investigator also explained that Salakielu had spread the shampoo or conditioner in front of the door in the cellblock to make it "a slippery entrance for anyone that enters." Lastly, Investigator opined that Inmate had tied the bed sheet to the door in the dayroom in an attempt to barricade the door "so no one could get in."

¶8     After the State rested, Salakielu argued that the district court should not bind over the aggravated kidnapping charge for trial, asserting that he "did not kidnap anybody" because it was Inmate, not Salakielu, who closed the cell door and intentionally or knowingly detained the officers in the cell. In response, the State argued that Salakielu's actions after Inmate shut the cell door amounted to kidnapping because "all of [Salakielu's and Cellmate's] actions . . . contribut[ed] to keeping [the officers] in the cell for a substantial period of time and preventing [the officers] from getting out."

¶9     The district court rejected Salakielu's argument and bound him over as charged. Salakielu subsequently moved to quash the bindover on the aggravated kidnapping charge. At the hearing on the motion to quash, both parties reiterated the arguments made at the preliminary hearing. Ultimately, the court was unpersuaded by Salakielu's arguments and denied his motion to quash.

ISSUE AND STANDARD OF REVIEW

¶10     Salakielu appeals the district court's interlocutory order denying his motion to quash the bindover, arguing the State failed to present evidence of all the elements of aggravated kidnapping. "A decision to bind over a criminal defendant for trial presents a mixed question of law and fact and requires the application of the

appropriate bindover standard to the underlying factual findings. In the bindover context, appellate courts give limited deference to a magistrate's application of the bindover standard to the facts of each case." *State v. Glosenger*, 2022 UT App 129, ¶ 13, 521 P.3d 915 (quotation simplified), *cert. denied*, 525 P.3d 1267 (Utah 2023).

ANALYSIS

¶11 "To bind a defendant over for trial, the State must show probable cause at a preliminary hearing by presenting sufficient evidence to establish that the crime charged has been committed and that the defendant has committed it." *State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300 (quotation simplified). Establishing probable cause at this stage therefore requires that the State "produce believable evidence of all the elements of the crime charged." *Id.* ¶ 15 (quotation simplified).

¶12 In this case, the State charged Salakielu with aggravated kidnapping. As relevant here, a person is guilty of kidnapping (the predicate offense to aggravated kidnapping) when the person "intentionally or knowingly, without authority of law, and against the will of an individual . . . detains or restrains the individual for any substantial period of time." Utah Code § 76-5-301(2). Thus, to bind Salakielu over on kidnapping, the State had to present evidence that Salakielu intentionally or knowingly detained the officers for a substantial period of time.

¶13 Salakielu contends the State did not put forth sufficient evidence to support binding him over on aggravated kidnapping because there was no evidence that Salakielu "intentionally or knowingly . . . detaine[d]" the officers for any substantial period of time, *see id.*, and the State's aggravated kidnapping theory rested solely on the notion that Salakielu's alleged riotous conduct after Inmate closed the officers in the cell satisfied the detention element of kidnapping. Relying on our supreme court's decision in *State v. Couch*, 635 P.2d 89 (Utah 1981), Salakielu contends that

none of his actions were sufficient to support a charge for kidnapping because Utah law "requires a period of detention longer than the minimum inherent in the commission" of other charged conduct, *id.* at 93, and here, "the officers' detention was merely incidental to Salakielu's alleged riotous conduct." Moreover, Salakielu argues that the State failed to present sufficient evidence to establish that by engaging in riotous behavior after Inmate closed the officers in the cell, he intentionally or knowingly detained the officers in this case.

¶14 In response, the State does not grapple with the merits of Salakielu's argument that the evidence supporting the detention element of kidnapping was insufficient. Instead, the State cites section 76-1-402 of the Utah Code and asserts that Salakielu's argument "presents a question based on merger," that is, "whether detaining the officers merges with the alleged riot."[3] To support its position, the State contends that the supreme court's analysis in *Couch* is "ultimately about merger" and not about whether sufficient evidence supported each statutory element of kidnapping. Resolution of Salakielu's appeal therefore turns on whether *Couch* is properly read as defining the elements of kidnapping or whether the Utah Supreme Court was expounding on the common law merger doctrine.

¶15 In *Couch*, the defendant drove the intoxicated victim from her workplace past her home without her consent and took her to

---

3. Merger is applied in appropriate cases "to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute" and "is most commonly applied to situations involving a defendant who has been charged with committing both a violent crime, in which a detention is inherent, and the crime of kidnapping based solely on the detention necessary to the commission of the companion crime." *State v. Diaz*, 2002 UT App 288, ¶ 17, 55 P.3d 1131, *cert. denied*, 63 P.3d 104 (Utah 2003).

a remote location where he sexually assaulted her. *Id.* at 91–92. Following a trial, a jury found the defendant guilty of, as relevant here, aggravated sexual assault and kidnapping. *Id.* at 91. On appeal, the defendant challenged the kidnapping conviction on the ground that there was "insufficient evidence" of kidnapping. *Id.* Specifically, the defendant argued "that his act of detaining [the victim] was merely incidental to the crime of aggravated sexual assault." *Id.* at 92.

¶16    The supreme court affirmed the defendant's kidnapping conviction. In so doing, the court first noted, in agreement with the defendant, that Utah's merger statute "has no application to this case." *Id.* at 92 n.1. The court then analyzed Utah's kidnapping statute to ascertain the meaning of kidnapping. *See id.* at 92–93. In a section titled "The Meaning of Kidnapping," the court explained that unlike "[s]ome jurisdictions [that] have adhered to the traditional view that any detention . . . , however slight or however closely related to another crime, is sufficient to support a kidnapping conviction," "our Utah statute expressly limits the circumstances under which a detention will constitute kidnapping." *Id.* at 92.

¶17    Turning next to the text of the kidnapping statute, which requires, among other things, "that the detention be for a 'substantial period,'" the supreme court focused on defining the conditions that would constitute a "detention" sufficient to support a conviction for kidnapping separate from another charge. *Id.* at 93. The court found that although the term "substantial period" "can be defined only by reference to a specific fact situation, it apparently requires a period of detention longer than the minimum inherent in the commission of a rape or a robbery." *Id.* Applying this definition of "substantial period" to the facts of the case, the court concluded that sufficient evidence supported the defendant's kidnapping conviction because "the kidnapping was not merely incidental or subsidiary to some other

crime, but was an independent, separately punishable offense." *Id.*

¶18 We conclude that *Couch* is properly read as a case about the elements of kidnapping, rather than merger. Critically, the supreme court's analysis in *Couch* hinged on the court's interpretation of the statutory elements of kidnapping—specifically the detention element—and whether sufficient evidence existed to support the charge of aggravated kidnapping as an act separate from the rape charge. Further, this reading is supported by several textual indicators in the *Couch* opinion itself, including (1) that the court framed the defendant's issue on appeal as whether "there was insufficient evidence of kidnapping," *id.* at 91; (2) that the court expressly acknowledged that Utah's merger statute "has no application to this case," *id.* at 92 n.1; and (3) that the court's discussion of the sufficiency issue occurred in a section titled "The Meaning of Kidnapping," *id.* at 92. Consequently, we agree with Salakielu that *Couch*'s exposition of the elements of kidnapping and recognition that the defendant's actions in detaining the victim separately from the sexual assault acts is a ruling on sufficiency and not merger, and thus is controlling in this case.

¶19 We do acknowledge that from *Couch* sprung a number of cases addressing the issue of common law merger. *See, e.g., State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, *overruled by State v. Wilder*, 2018 UT 17, 420 P.3d 1064, *and State v. Johnson*, 2022 UT 14, 508 P.3d 100; *State v. Lee*, 2006 UT 5, 128 P.3d 1179, *overruled by Wilder*, 2018 UT 17; *State v. Kataria*, 2014 UT App 236, 336 P.3d 1093, *cert. denied*, 343 P.3d 708 (Utah 2015); *Met v. State*, 2016 UT 51, 388 P.3d 447; *Wilder*, 2018 UT 17. However, at the time *Couch* was decided, the merger statute was already in effect. Thus, if the supreme court had intended to make *Couch* a decision about the merger doctrine, it could have. But as noted, it did not. Moreover, none of these subsequent cases have purported to overturn *Couch*'s analysis of the elements of a kidnapping charge as they relate to a

sufficiency challenge. Accordingly, we will not go back and reread *Couch* as being a common law merger case merely because some subsequent cases have occasionally used it as a springboard for some of the principles used in Utah's merger doctrine.

¶20   Because *Couch* was an elements case, not a merger case, and because the State has not responded to Salakielu's argument that insufficient evidence exists to support the bindover on the aggravated kidnapping charge, the State has waived this argument.[4] *See State v. Roberts*, 2015 UT 24, ¶ 20, 345 P.3d 1226 ("[A]n appellee who fails to respond to the merits of an appellant's argument will risk default."); *Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶ 10, 279 P.3d 391 (explaining that appellate courts "require the brief of the appellee to contain the contentions and reasons of the appellee with respect to the issues presented in the opposing brief" (quotation simplified)). As a result, on the facts of this case, Salakielu necessarily prevails on appeal.

CONCLUSION

¶21   The district court abused its discretion when it denied Salakielu's motion to quash the bindover for aggravated kidnapping. The State did not put forth sufficient evidence to support the bindover because there was no evidence that Salakielu intentionally or knowingly detained the officers for a substantial period of time separate from any riotous behavior on his part. We therefore reverse the court's order and remand the matter with instruction to quash Salakielu's bindover on the aggravated kidnapping charge.

——————

4. Indeed, at oral argument before this court, the State expressly agreed with Judge Tenney that if we interpret *Couch* as a sufficiency case, then Salakielu must prevail because the State has not otherwise responded to Salakielu's argument.