2019 UT App 166

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SAUL MARTINEZ,
Appellant.

Opinion
No. 20161019-CA
Filed October 18, 2019

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 151907946

Alexandra S. McCallum, Wojciech S. Nitecki, and
Lacey C. Singleton, Attorneys for Appellant

Sean D. Reyes and Nathan D. Anderson, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     On a dark and rainy night, Saul Martinez shot at his wife's lover on the side of a road in front of an off-duty police sergeant (Sergeant). Martinez was convicted of attempted murder, aggravated assault, three counts of felony discharge of a firearm, and possession of a dangerous weapon by a restricted person. Martinez appeals, contending that the trial court erred when it permitted the jury to hear arguably inadmissible hearsay testimony. Further, Martinez contends that his convictions for felony discharge of a firearm should be vacated, arguing that they should have merged with his attempted murder conviction. We affirm.

## BACKGROUND[1]

¶2 While driving home to Tooele, Utah, from work one night, Sergeant noticed a man (Victim) walking in the heavy rain along the side of the road carrying a gas can. Victim was walking to his car, which had run out of gas. Sergeant picked up Victim in his personal, unmarked truck and drove Victim to his car. As Victim got out of Sergeant's truck, a white SUV pulled up behind them. Victim identified the driver as Martinez and told Sergeant, "This guy wants to kill me." Sergeant responded, "What?" Victim again said, "This guy is going to kill me." Looking in his side-view mirror, Sergeant saw Martinez get out of the SUV and walk toward Victim holding a large, silver handgun. Sergeant yelled at Victim to "get back in the truck." Victim jumped into the truck, and as the two men sped away, Martinez rapidly fired three shots toward Sergeant's truck. All three bullets lodged in the passenger side of the truck where Victim was sitting.

¶3 Earlier that day, Martinez had borrowed a white SUV from his neighbor that he never returned. The day after the shooting, police found the SUV abandoned approximately ten miles from the scene of the shooting. Martinez was nowhere to be found at the time, but he was located and arrested four months later in Los Angeles, California. Martinez was charged with attempted murder, aggravated assault, use of a firearm by a restricted person, and three counts of felony discharge of a firearm.

---

1. On appeal from a jury verdict, "we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Gregg v. State*, 2012 UT 32, ¶ 2, 279 P.3d 396 (quotation simplified).

¶4    At trial, the jury heard testimony that Martinez and his wife (Wife) were having marital problems. They had been together for sixteen years and had a daughter (Daughter). Around the same time that the couple began having marital problems, Victim and Wife developed a friendship that Victim's work supervisor and Wife's brother (Brother-in-law) believed was romantic in nature, though Victim denied such a relationship. Martinez thought that Victim was trying "to steal [Wife] and [Daughter]." Witnesses at trial testified that on three separate occasions, Martinez either threatened Victim or expressed a plan to kill him.

¶5    Approximately one month before the shooting, Victim, Wife, Daughter, and others were eating dinner at a friend's house. Martinez knocked on the door and let himself in without waiting for someone to answer the door. Martinez looked "upset" and, without saying a word, positioned his fingers in the shape of a gun, pointed it at Victim for approximately three or four seconds, and then left with Wife and Daughter.

¶6    Three days before the shooting, Victim's co-worker informed him that Martinez was outside of the restaurant where they worked, and Victim told his co-worker to "call the police because [Martinez] had threatened to kill [him]." When Victim finished working, Martinez was still outside the restaurant speaking with Victim's supervisor, who was a friend of Martinez. Victim approached Martinez and asked him if he was "looking for [him] to kill [him]." When counsel inquired why Victim would say that to Martinez, Victim testified, "Because all the people from Tooele, they were telling me that he was looking for me . . . to kill me." Martinez's counsel objected to the answer as hearsay. The court overruled the objection, determining that Victim's statement was not being "offered for the truth of the matter asserted." The prosecutor then repeated his question, and Victim again answered, "Because in Tooele everybody was telling me that [Martinez] wanted to kill me." Victim testified

that in response to Victim's inquiry about why he was waiting for Victim, Martinez replied, "No, not now or here at this moment, but I know where you . . . live, and sooner or later I will kill you."

¶7 Just hours before the shooting, Martinez told Brother-in-law that he was planning to kill Victim. Brother-in-law testified that Martinez had been drinking when he arrived at Brother-in-law's home and that Martinez was there "to say goodbye" to him and his family. Martinez reported that he was going to be leaving town soon as he "already had everything prepared to be able to kill [Victim]" because he was not going to let Victim "steal" Wife and Daughter from him. Martinez appeared "extremely nervous" and told Brother-in-law "that he couldn't handle everything that was going on, that he had to end all of this." Martinez then showed Brother-in-law his gun and was "very clear" that he wanted to kill Victim and that the reason he had the gun was "to do it." And while Brother-in-law testified that Martinez would occasionally jokingly threaten to kill people, "that day [he] felt that [Martinez] was serious."

¶8 Martinez was convicted on all counts. Martinez moved to vacate the three counts of felony discharge, arguing that those convictions should merge with his attempted murder conviction because Martinez attempted to murder Victim by shooting at him and that discharging his firearm was therefore part of the same criminal episode. The trial court denied the motion, and Martinez appeals.

ISSUES AND STANDARDS OF REVIEW

¶9 Martinez raises two issues on appeal. First, he argues that certain out-of-court statements made by unidentified persons and admitted at trial were hearsay and that the trial court erred in allowing the jury to hear Victim's testimony regarding out-of-court statements. "In reviewing hearsay rulings, we review legal

questions for correctness, factual questions for clear error, and the final ruling on admissibility for abuse of discretion." *State v. McNeil*, 2013 UT App 134, ¶ 14, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699. If a trial court errs in admitting hearsay, an appellant will prevail on appeal only upon a showing that there was a "reasonable likelihood of a more favorable result" absent the statements. *Id.* ¶ 41 (quotation simplified).

¶10    Second, Martinez contends that the trial court erred in refusing to merge his convictions for felony discharge of a firearm with his conviction for attempted murder. Merger issues are questions of law reviewed for correctness. *State v. Wilder*, 2018 UT 17, ¶ 15, 420 P.3d 1064.

ANALYSIS

I. Hearsay

¶11    Martinez first contends that the trial court erred in admitting Victim's testimony that multiple unidentified residents of Tooele relayed to him that Martinez was looking for Victim to kill him. Martinez argues that this testimony was inadmissible hearsay and that its admission at trial prejudiced him. Hearsay is an out-of-court statement that is offered "to prove the truth of the matter asserted." Utah R. Evid. 801(c). The Utah Rules of Evidence prohibit the admission of hearsay unless the evidence meets one of several exceptions. *Id.* R. 802. However, even if hearsay is erroneously admitted, a challenger must show prejudice to prevail on appeal. *State v. Boyle*, 2019 UT App 28, ¶ 16, 440 P.3d 720; *see also State v. Vargas*, 2001 UT 5, ¶ 48, 20 P.3d 271 ("We will not reverse the trial court for committing harmless error." (quotation simplified)). "[O]ur prejudice analysis asks whether we remain confident that the verdict would be the same" had the hearsay been excluded. *State v. McNeil*, 2016 UT 3, ¶ 31, 365 P.3d 699. To reverse a jury verdict, it is not enough that there is "a mere possibility" of

a different outcome; there must be "a reasonable likelihood that the error affected the result." *State v. Jeffs*, 2010 UT 49, ¶ 37, 243 P.3d 1250 (quotation simplified).

¶12    At trial, the prosecutor questioned Victim about why he asked Martinez if he was looking for Victim to kill him. In response, Victim testified two different times that he was told by "everybody" and "all the people" in Tooele that Martinez was looking for him to kill him. The trial court overruled Martinez's hearsay objection. Martinez argues that Victim's two statements were offered for their truth and that he was prejudiced by their admission. The State argues that the statements were only "offered to explain why Victim confronted Martinez." For this appeal, we will assume, without deciding, that Victim's testimony regarding rumors he heard from unidentified Tooele residents constituted inadmissible hearsay. *See Boyle*, 2019 UT App 28, ¶ 16. But we conclude that any error in admitting the statements was not prejudicial in this case.

¶13    We consider several factors when determining whether the admission of hearsay evidence is harmful in a given case. *State v. McNeil*, 2013 UT App 134, ¶ 52, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699.

> These include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (quotation simplified). We "may also consider the degree of emphasis the prosecution placed on the evidence in presenting its case." *Id.*

¶14 Martinez contends that the admitted hearsay statements made it more likely that the jury would determine that Martinez was the person who shot at Victim. He argues that the improper admission of the hearsay statements left the jury with the impression that Martinez had communicated to a large number of Tooele residents his intent to kill Victim, that his threats seemed so serious that others felt the need to warn Victim, and that Martinez had actually taken steps to look for Victim. These rumors suggested that "the planned pursuit of [Victim] . . . led Martinez to the crime scene" and undermined Martinez's theory that the crime was "a chance encounter involving a random shooter." Martinez concludes that there was "a reasonable likelihood that but for the hearsay, the jury would have doubted that Martinez was the shooter or that he acted with the intent to kill [Victim]." We are not persuaded. Nearly all the information communicated in the two hearsay statements was cumulative and corroborated by other testimony at trial and therefore was not critical evidence in the State's overall case.

¶15 As described above, Martinez threatened Victim when he rushed into a house looking "upset" and arranged his fingers in the shape of a gun, pointing it at Victim for approximately three or four seconds. Three days before the shooting, Martinez threatened Victim in front of Victim's supervisor. Victim asked Martinez "if [Martinez] was looking for [Victim] to kill [him]." Martinez replied, "No, not now or here at this moment, but I know where you . . . live, and sooner or later I will kill you." And just hours before the shooting, Martinez confided in Brother-in-law that he planned to kill Victim and then proceeded to show Brother-in-law his gun.[2]

---

2. Martinez argues that "the jury had reason to doubt that Martinez was serious" in telling Brother-in-law that he was going to kill Victim because "Martinez had jokingly talked about
(continued…)

¶16   We agree with the State that "vague statements from unknown Tooele residents made at unknown times are not more believable than Martinez's own, detailed statements made days and hours before the shooting." The supervisor's and Brother-in-law's testimonies are particularly strong evidence because both had personal connections to Martinez. Brother-in-law in particular was very specific, stating that Martinez had a gun and "had everything prepared" to go after Victim mere hours before the shooting. The State also placed little emphasis on the hearsay statements from random Tooele residents. Over the course of the three-day trial, the rumors from Tooele residents came up only one time during Victim's testimony. Neither the State nor Martinez questioned any other witness about the rumors, and the State did not refer to those statements during its closing argument.

¶17   Additionally, we are not persuaded that the jury would have interpreted the phrases "everybody" and "all the people" of Tooele to literally mean that a large number of Tooele residents approached Victim to warn him that Martinez was looking for him to kill him. A reasonable juror would interpret those statements as exaggeration. *Cf. United States v. Recio*, 884 F.3d 230, 238 (4th Cir. 2018) (stating that a jury could interpret a statement that someone "always" carried a gun as exaggerated, "describing a pattern of regularly (though not invariably) carrying a gun" (quotation simplified)); *Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1156 (C.D. Cal. 2005) (stating that clearly exaggerated, colloquial language "does not lend itself to a literal

---

(…continued)
killing people before." While Brother-in-law acknowledged that Martinez had generally threatened to kill as a way to "play around with people," Brother-in-law testified that on "that day [he] felt that [Martinez] was serious" and that "[i]t was very clear to [him] that what [Martinez] wanted to do was kill."

interpretation by the average reader"). And we are not persuaded that the vague statements from unidentified Tooele residents carried more weight and credibility with the jury than the testimony of people who had actual relationships with Martinez. The State also presented stronger evidence demonstrating that Martinez was the one who shot at Victim than just the two hearsay statements. Apart from Martinez making his intentions and plans known to others, Victim saw the shooter and was "100 percent" certain it was Martinez. Further evidence showed that Martinez borrowed a white SUV from his neighbor the day of the shooting, that Victim and Sergeant each said the shooter was driving a white SUV, that the neighbor's SUV was found abandoned the next day, and that Martinez had seemingly left town the day after the shooting and was later found in California.

¶18 To reverse a jury verdict based on the erroneous admission of hearsay, an appellant must present more than "a mere possibility" of a different outcome; he must show "a reasonable likelihood that the [hearsay] affected the result." *State v. Jeffs*, 2010 UT 49, ¶ 37, 243 P.3d 1250 (quotation simplified). Without the two hearsay statements, the jury still would have heard evidence of Martinez's multiple threats to kill Victim, Victim's identification of Martinez at the scene of the crime, that Martinez borrowed a vehicle the day of the shooting that matched the description of the one the shooter was driving, that the vehicle was found abandoned the day after the shooting, and that Martinez was located in a different state several months after the shooting. We determine that any erroneous admission of the two hearsay statements is not enough to undermine our confidence in the verdict, and even if the hearsay had been excluded, Martinez has not shown a "reasonable likelihood that the error affected the outcome in the trial court." *See State v. McNeil*, 2013 UT App 134, ¶ 57, 302 P.3d 844 (quotation simplified), *aff'd*, 2016 UT 3, 365 P.3d 699.

## II. Merger

¶19 Martinez next asserts that the trial court erred in denying his motion to vacate his felony discharge-of-a-firearm convictions on the ground that those offenses should have merged with his attempted murder conviction. Merger is a legal doctrine designed "to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Diaz*, 2002 UT App 288, ¶ 17, 55 P.3d 1131. Merger becomes an issue when "two statutes or two portions of a single statute proscribe certain conduct, and the question is whether the defendant can be punished twice because his conduct violates both proscriptions." *State v. Lopez*, 2004 UT App 410, ¶ 4, 103 P.3d 153 (quotation simplified). Utah Code section 76-1-402 provides, "[W]hen the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision . . . ." Utah Code Ann. § 76-1-402(1) (LexisNexis 2012). Similarly, if an offense is a lesser included offense of another charged offense, a defendant may not be convicted of both offenses. *See id.* § 76-1-402(3). Pursuant to these provisions, Martinez argues that he is entitled to merger of his attempted murder and felony discharge-of-a-firearm convictions.[3] But even accepting that section 76-1-402, standing alone, would require merger of

---

3. Martinez initially argued another ground for merger—the common law merger doctrine as described in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243. After Martinez filed his brief, our supreme court issued a decision in *State v. Wilder*, 2018 UT 17, 420 P.3d 1064, overruling *Finlayson*'s common-law merger test, *id.* ¶ 38. Martinez acknowledges in his reply brief that common-law merger no longer applies, and we do not address this argument further.

Martinez's crimes, Martinez's merger claim ultimately fails because the Utah Code expressly allows cumulative punishments for felony discharge of a firearm and attempted murder. *See id.* § 76-5-203(5)(a).

¶20    Our supreme court has recognized that "some statutes operate as 'enhancement statutes.'" *State v. Bond*, 2015 UT 88, ¶ 70, 361 P.3d 104. Such statutes "are different in nature than other criminal statutes because they single out particular characteristics of criminal conduct as warranting harsher punishment." *State v. Smith*, 2005 UT 57, ¶ 10, 122 P.3d 615 (quotation simplified). "And where the Legislature has designated a statute as an enhancing statute, the merger doctrine has no effect." *Bond*, 2015 UT 88, ¶ 70; *see also State v. Alfatlawi*, 2006 UT App 511, ¶ 39, 153 P.3d 804 ("[E]nhancement statutes do not violate the Fifth Amendment's prohibition on double jeopardy if the legislature specifically authorized cumulative punishment for a crime committed with a dangerous weapon."). For the legislature to exempt an offense from operation of the merger doctrine, the plain language and structure of the pertinent statute must provide "an explicit indication of legislative intent." *Bond*, 2015 UT 88, ¶ 70 (quotation simplified). "Only when such an explicit indication of legislative intent is present in the specific offense statute will we consider it appropriate to exempt that statute from operation of the general merger requirements . . . ." *Smith*, 2005 UT 57, ¶ 11.

¶21    Section 76-5-203 of the Utah Code contains a list of "predicate offense[s]" that "do[] not merge with the crime of murder." *See* Utah Code Ann. § 76-5-203(5)(a). The phrase "predicate offense" is a defined term, *see id.* § 76-5-203(1), and the definition our legislature has chosen for that term includes, among other things, felony "discharge of a firearm or dangerous weapon," *id.* § 76-5-203(1)(v). A plain reading of this provision demonstrates that the legislature explicitly indicated its intent to

preclude felony discharge of a firearm from merging with a non-aggravated murder[4]—or attempted murder—charge.

¶22 Martinez asserts that the merger provision should be read as pertaining only to murder charges premised on a felony-murder theory—not to situations where knowing or intentional murder is alleged. But merger with respect to felony murder is addressed separately in section 76-5-203(5)(b), which explicitly pertains to circumstances where a person "is convicted of murder, based on a predicate offense." *Id.* § 76-6-203(5)(b). Thus, construing section 76-5-203(5)(a) as pertaining only to felony murder would render section 76-5-203(5)(b) superfluous. When engaging in plain-language analysis of a statute, we "avoid interpretations that will render portions of a statute superfluous or inoperative." *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958. Thus, we cannot accept Martinez's assertion regarding the limitations of section 76-5-203(5)(a).

¶23 Martinez also contends that section 76-5-203(5)(a) does not apply to attempt crimes, because the statute states that the enumerated predicate offenses are prohibited from merging with "murder" and does not explicitly mention attempted murder. *See* Utah Code Ann. § 76-5-203(5)(a). However, "[a]ttempt crimes are derivatives of completed crimes, and the express language of both the completed crime statute and the attempt statute

---

4. Contemporaneous with this decision, we issued a decision in *State v. Bowden*, 2019 UT App 167, in which we held that a defendant's felony discharge-of-a-firearm convictions should have merged with his attempted aggravated murder conviction. Although that result may appear inconsistent with our decision here, differences between the plain language of the non-aggravated murder statute at issue in this case and that of the aggravated murder statute at issue in *Bowden* mandate such a result. *See id.* ¶ 25 n.6; *id.* ¶¶ 27–30 (Harris, J., concurring).

determines the elements of the attempt crime." *State v. Casey*, 2003 UT 55, ¶ 13, 82 P.3d 1106. Strictly speaking, there is no stand-alone attempted murder statute that is separate from the murder statute. *See id.* ¶ 43 n.11. Rather, attempted murder is basically an incomplete offense. To determine whether an attempted murder has been committed, we must look to the elements of the murder statute and evaluate whether an actor has taken a "substantial step toward commission of the [murder]." *See* Utah Code Ann. § 76-4-101(1) (LexisNexis 2012); *see also Casey*, 2003 UT 55, ¶ 13 ("[A] conviction for attempted murder must satisfy the elements of the murder statute, with the obvious exception that the murder need not be completed, and the attempt statute."). Indeed, Martinez was charged with attempted murder pursuant to section 76-5-203, the murder statute. Because both murder and attempted murder are evaluated using the same statutory elements, the prohibition against a predicate offense merging with murder also prevents that offense from merging with attempted murder. Thus, the trial court did not err in denying Martinez's motion to vacate his felony discharge-of-a-firearm convictions.

## CONCLUSION

¶24  We conclude that the trial court's admission of two hearsay statements, even if erroneous, did not prejudice Martinez. Additionally, we hold that the crime of felony discharge of a firearm does not merge with the crime of attempted murder. Accordingly, we affirm Martinez's convictions.

———————