**2019 UT App 167**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JEREMY MICHAEL BOWDEN,
Appellant.

Opinion
No. 20170318-CA
Filed October 18, 2019

Third District Court, West Jordan Department
The Honorable L. Douglas Hogan
No. 161400285

Andrea J. Garland and Wesley J. Howard, Attorneys
for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE APPLEBY concurred. JUDGE RYAN M.
HARRIS concurred, with opinion.

CHRISTIANSEN FORSTER, Judge:

¶1      While running from the police one night, Jeremy Michael Bowden fired six shots at a police officer and hit him once in the chest. A jury later convicted Bowden of attempted aggravated murder, obstruction of justice, five counts of felony discharge of a firearm, receiving a stolen motor vehicle, and failure to stop at the command of a law enforcement officer. Bowden appeals. Sufficient evidence was submitted at trial for us to affirm Bowden's attempted aggravated murder and obstruction convictions, but we determine that Bowden's felony discharge convictions should have merged with his attempted aggravated

murder conviction. We thus vacate Bowden's felony discharge convictions and remand for resentencing.

## BACKGROUND[1]

¶2    In October 2015, a truck was stolen along with "[s]ix or seven" guns from the truck-owner's house. Several weeks later, Bowden drove that same truck to an internet gaming facility—a location known to law enforcement for criminal activity. Officer Clark, who was on patrol in the area, noticed the truck, which had dealership license plates, and suspected that it was stolen. Accessing a national database, Clark confirmed that the truck matched the description of a truck that had recently been stolen. Clark contacted dispatch and requested an unmarked police car to take over his position because he was in a marked police vehicle that "stuck out like a sore thumb." Clark observed Bowden leaving the gaming facility and told dispatch, "[N]evermind[,] I've got a male approaching the truck now." As Bowden opened the door to the stolen truck, Clark got out of his vehicle, drew his firearm, and ordered Bowden to get on the ground. Bowden turned and ran.

¶3    Clark informed dispatch that he was chasing a white male in his thirties who was wearing blue jeans, a black leather jacket or shirt, and a do-rag or bandana. Bowden ran through two parking lots toward a retail store. Officer Tsouras, who was already parked near the scene, responded to the dispatch call. About three to five seconds after Clark radioed that the suspect was fleeing on foot, Tsouras saw only one person running in that area, and that person matched Clark's description

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Prater*, 2017 UT 13, n.1, 392 P.3d 398 (quotation simplified).

of Bowden. Tsouras described the fleeing suspect as a "white male" wearing a "[b]lack jacket, blue jeans, and beanie, skull cap-type headgear." Tsouras watched the suspect run to a nearby retail store parking lot. A store manager had just exited the building and saw "a man running . . . towards [her] at a very rapid pace." The suspect got close enough to the store manager to "touch [her] shoulder" and yelled, "Get . . . out of my way." The store manager described the suspect as wearing a "dark" jacket and "dark pants." When asked about the specific color of the jacket, she stated that she did not "remember for sure," but that it could have been green or khaki. The store manager also reported that the suspect was wearing a dark beanie or a hat of some kind.[2]

¶4     Tsouras pursued Bowden in his police vehicle with the lights and siren activated. When Tsouras was within eight to ten feet of Bowden, he observed Bowden rotate "his upper body towards [Tsouras's] vehicle" and a "bright flash," which Tsouras described as "a muzzle flash." At that same time, a window in Tsouras's vehicle shattered. Tsouras radioed in that shots had been fired and requested backup. As Tsouras sped away from Bowden, he heard four more gunshots and saw three more muzzle flashes in his direction coming from Bowden's gun. Every window in Tsouras's vehicle was either "blown out or shattered." Four bullets struck the exterior of Tsouras's vehicle and one bullet entered the vehicle, went through a laptop computer, and struck Tsouras in the chest. Fortunately, Tsouras was wearing a bulletproof vest, which stopped the bullet. After shooting at Tsouras, Bowden ran and disappeared from Tsouras's view. Tsouras thought he saw Bowden at a nearby car wash and shot at the person he thought was the suspect. But instead of shooting Bowden, Tsouras mistakenly shot an innocent bystander.

---

2. At trial, the store manager acknowledged that shortly after the incident, she told an officer that Bowden's shoes were dark but testified that she no longer remembered.

¶5      A witness who was across the street observed part of this event. The witness saw only one person running in the parking lot and then saw a police car with its lights on approaching "at a very high rate of speed" turn into that parking lot. When the police car came parallel with Bowden, the witness immediately heard five or six gunshots. He described the shooter as wearing a coat or jacket and dark pants. When asked about the color of the jacket, the witness said, "I'm not 100 percent sure, but it looked to be light in color." Also when asked if the suspect was wearing a hat, Witness stated he "d[id]n't think so." The witness also said that "[he] wish[ed] [he] had focused more on what the person was wearing" but that instead "[he] was focused more on what [the suspect] was doing." The witness then saw a second police vehicle drive into the parking lot.

¶6      Officer O'Gwin drove into the parking lot just as Bowden was shooting at Tsouras and Tsouras was trying to get away. O'Gwin described the shooter as a "male individual wearing a dark hoodie and blue jeans" and "white shoes." O'Gwin parked and got out of his vehicle, drew his firearm, and commanded Bowden to "[g]et on the ground." Ignoring O'Gwin's command, Bowden hid behind a dumpster. O'Gwin went to check on Tsouras, and Bowden fired several shots toward O'Gwin. O'Gwin ran back to his vehicle and saw Bowden jump over a cinderblock wall separating the parking lot from an apartment complex. O'Gwin's dashcam video did not capture Bowden's face, but it did show that the shooter was wearing blue jeans, a dark jacket, and white shoes.

¶7      As part of a containment area set up after Tsouras radioed that shots had been fired, two officers were stationed at a nearby apartment complex. The two officers saw Bowden jump a barbed-wire fence wearing a maroon t-shirt, jeans, and no headgear. The officers pursued Bowden on foot yelling at him to stop and issuing the warning, "Taser, taser, taser." One of the officers deployed two Taser cartridges, but Bowden ripped the Taser cords off and continued running. Bowden eventually

slowed down and started pacing back and forth. Bowden was then ordered to "[g]et on the ground." When he again ignored the command, the officer fired another Taser cartridge at Bowden. But Bowden remained standing until another cartridge brought him to the ground.

¶8    The officers arrested Bowden and found an unfired .45 caliber bullet manufactured by Federal in his pocket. A search of the area uncovered a 9mm handgun and an ejected magazine from that handgun near the place where Bowden jumped the retaining wall, but no dark jacket, bandana, or hat was ever found. An analysis of the bullet casings found in the parking lot where the shooting took place revealed that all of the bullets fired at Tsouras came from the same 9mm handgun, and Bowden stipulated at trial that this 9mm handgun was the gun that fired at Tsouras. One of the 9mm bullets fired at Tsouras was manufactured by Remington, and the other five 9mm bullets were manufactured by Winchester. DNA analysis was performed on the 9mm handgun, the magazine, and the bullet casings recovered from the parking lot. The test excluded Bowden as the source of the DNA on the magazine. And the test revealed three separate DNA profiles on the bullet casings and four DNA profiles on the handgun; but there was not a large enough sample to include or exclude Bowden as a source of DNA on those items.

¶9    After Bowden's arrest, police searched the stolen truck. They found Bowden's identification and an iPad with the name "J. Bowden." Police also found fifteen guns of various makes and calibers, gun parts, and bullets of various calibers and brands, including Ruger, Winchester, and Federal. One of the 9mm bullets found in the truck was made by Winchester—the same manufacturer as one of the bullet casings found at the scene of the shooting. Some, but not all, of the guns located in the stolen truck belonged to the truck's owner. But the truck's owner testified that he had never owned a 9mm handgun or 9mm ammunition.

¶10    At trial, Bowden moved to exclude the evidence of the unfired .45 caliber Federal bullet found in his pocket at the time of his arrest, arguing that the evidence was irrelevant and more prejudicial than probative because the bullet could not have fit into the 9mm gun used to shoot Tsouras. Bowden also moved for a directed verdict at the close of the State's case, arguing that while Clark correctly identified him outside the internet gaming facility, the other descriptions of the suspect seen running from police and firing at Tsouras were inconsistent and therefore insufficient to prove that he was the person who shot at and shot Tsouras. The trial court denied both motions, and the jury convicted Bowden as charged.

¶11    Prior to sentencing, Bowden moved to merge his five felony discharge-of-a-firearm convictions with his attempted aggravated murder conviction. The State opposed the motion but agreed that one count of felony discharge should merge with the attempted aggravated murder conviction. The trial court vacated one count of felony discharge of a firearm, agreeing that one count should merge with the conviction for attempted aggravated murder. The trial court sentenced Bowden to consecutive prison terms on his attempted aggravated murder, receiving stolen property, and obstruction of justice convictions, and ordered the sentences on his four felony discharge-of-a-firearm convictions to run concurrently to one another and to his other convictions. Bowden now appeals.


ISSUES AND STANDARDS OF REVIEW

¶12    Bowden raises three issues on appeal. First, he contends that the evidence presented at trial was insufficient to identify him as the person who shot Tsouras. "When a defendant challenges a jury verdict for insufficiency of the evidence, we review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict." *State v. Noor*, 2012 UT App 187, ¶ 4, 283 P.3d 543 (quotation simplified); *see also State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 ("On a

sufficiency of the evidence claim we give substantial deference to the jury."). We will reverse a jury verdict only when the evidence "is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Noor*, 2012 UT App 187, ¶ 4 (quotation simplified).[3]

¶13    Second, Bowden contends that the trial court erred in admitting the evidence of the bullet found in his pocket at the time of his arrest, arguing the evidence was irrelevant and

---

3. The State notes that as part of Bowden's sufficiency of the evidence argument, he contends that the evidence was insufficient to prove he was the person who discarded the firearm used in the shooting and that his obstruction of justice conviction should therefore be vacated. Bowden asserts that "[i]f this Court finds insufficient evidence to prove Bowden's identity as the shooter, then it follows that evidence of Bowden having been the person to have discarded the gun 'with intent to hinder, delay, or prevent' officers finding the gun is necessarily insufficient." (Quoting Utah Code Ann. § 76-8-306(1).) Bowden did not preserve this argument at trial, and "[a]s a general rule, claims not raised before the trial court may not be raised on appeal . . . unless a defendant can demonstrate that . . . 'plain error' occurred." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. To prevail on an unpreserved insufficiency claim, Bowden must show that the "insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *See id.* ¶ 17. As explained later in this opinion, Bowden's identification as the shooter was supported by sufficient evidence, including witness testimony, surveillance and dash cam video, and evidence that Bowden fled and was arrested near the scene of the shooting. As this evidence was sufficient to support Bowden's conviction of attempted aggravated murder, we also conclude that the trial court did not plainly err by entering a judgment of conviction against Bowden for obstruction of justice.

prejudicial. Trial courts "have wide discretion in determining relevance, probative value, and prejudice." *State v. Kell*, 2002 UT 106, ¶ 32, 61 P.3d 1019. We review admissibility determinations made by the trial court for abuse of discretion, *see State v. Boyd*, 2001 UT 30, ¶ 23, 25 P.3d 985, and we will overturn a jury verdict only if the admission of the contested evidence reasonably affected the likelihood of a different verdict, *State v. Johnson*, 2007 UT App 184, ¶ 34, 163 P.3d 695.

¶14    Third, Bowden contends that the court erred in merging only one of his five felony discharge-of-a-firearm convictions with his attempted aggravated murder conviction. Merger is a question of law, which we review for correctness. *State v. Smith*, 2005 UT 57, ¶ 6, 122 P.3d 615.

ANALYSIS

I. Evidence of Identity

¶15    Bowden contends that the evidence presented at trial was insufficient to support his convictions and to identify him as the person who shot Tsouras. When reviewing a "sufficiency of the evidence claim we give substantial deference to the jury." *State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664. "Direct evidence is not required" to sustain a verdict, and the jury may return a guilty verdict "on the sole basis of circumstantial evidence." *State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645. "In the absence of direct evidence, the jury's conclusion must be based upon reasonable inference and not mere speculation." *State v. Cristobal*, 2010 UT App 228, ¶ 10, 238 P.3d 1096. It is "well-established that identification can be inferred from circumstantial evidence; therefore, direct, in-court identification is not required." *State v. Isom*, 2015 UT App 160, ¶ 23 n.2, 354 P.3d 791 (quoting *United States v. Boyd*, 447 F. App'x 684, 690 (6th Cir. 2011)). Presence and flight from a crime scene can establish a defendant's guilt only if the surrounding circumstances "make it more probable that he was an active participant in the crime than the equally

reasonable possibility that he was merely present during the crime." *Cristobal*, 2010 UT App 228, ¶ 17.

¶16    Bowden contends that the evidence was insufficient to prove his identity as the shooter. He notes that there were some inconsistencies in the witnesses' descriptions of him, that some witnesses did not have the opportunity to view the shooter and could not testify whether there was more than one person in the area, that the gaming facility was in a location known for criminal activity, that Tsouras incorrectly identified the shooter and shot an innocent bystander, and that video from the internet gaming facility and the containment area showed similarly dressed men. He argues that the evidence supported at least two "equally likely" conclusions: "[1] Bowden shot at Tsouras, or [2] a different man in the area shot at Tsouras." Therefore, the jury's conclusion that Bowden was the shooter, he argues, amounts to mere speculation. We are not persuaded. While the evidence Bowden cites may have cast doubt on his identity as the shooter, the record provides ample evidence, both direct and circumstantial, to support the jury's determination that Bowden was the shooter.

¶17    Here, we agree with the State that much more than "some evidence" established that Bowden was the one who shot Tsouras. *See id.* ¶ 10. Specifically, after Clark identified himself as a law enforcement officer, Bowden fled. Clark described the suspect as a white male in his thirties wearing blue jeans, a black leather jacket or shirt, and a do-rag or bandana. As Bowden ran through two parking lots, Tsouras saw only one person running in the area whom he described as a "white male" wearing a "[b]lack jacket, blue jeans, and beanie, skull cap-type headgear." A retail store manager testified that Bowden yelled at her to get out of his way and described him as white, wearing a "dark" jacket, "dark pants," and a dark "beanie or a hat." She said that she did not remember the color of the jacket but that it could have been green or khaki. Another witness to the shooting described Bowden as wearing a coat or jacket and dark pants. The witness said that he was "not 100 percent sure," but that the

jacket's color looked light and he did not think Bowden was wearing a hat. However, this witness acknowledged he was more focused on what the shooter was doing than on what the shooter was wearing. The other officer, O'Gwin, whom the suspect also fired on, described Bowden as a "male individual wearing a dark hoodie and blue jeans" and "white shoes," and his dash cam video showed that the shooter was wearing blue jeans, a dark jacket, and white shoes. With little variation, the shooter was consistently described as a white male wearing dark or blue jeans or pants, a dark or black jacket or other top, and some type of head covering. The two witnesses who testified differently acknowledged that they were not focused on what the shooter was wearing or could not remember the details from that night. Most importantly, the business center's surveillance video and O'Gwin's dash cam video taken of the shooter matched the initial description from Clark, the officer who had the most time to observe Bowden.

¶18   Moreover, less than twenty minutes after the shooting, officers located Bowden in the containment area wearing jeans but no jacket or headgear. Officers observed Bowden jump a fence, and when they approached him, Bowden fled again. It was not until the officers deployed several Tasers that they were able to apprehend him. Bowden was also arrested with bloodied hands—injuries for which he had no explanation. A search of the area uncovered the firearm and the ejected magazine used in the shooting in close proximity to where Bowden was seen. A search of the stolen vehicle Bowden was using that night uncovered his identification, his iPad, numerous guns, and ammunition, some of which matched the brand and caliber used in the shooting.

¶19   While minor discrepancies exist in the testimonies identifying Bowden, there is substantial circumstantial evidence to support the jury's verdict as a "reasonable inference and not mere speculation." *See id.* And because we will reverse a jury verdict "only if the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime," *State*

*v. Gonzales*, 2000 UT App 136, ¶ 10, 2 P.3d 954 (quotation simplified), we decline to disturb the jury's determination that Bowden was the person who shot at and shot Tsouras.

## II. Admission of the Unfired Bullet

¶20　Bowden contends that the trial court erred in denying his motion to exclude evidence of the unfired .45 caliber Federal bullet found in his pocket at the time of his arrest. Specifically, Bowden contends that the admission of the unfired bullet violated rules 401, 402, and 403 of the Utah Rules of Evidence, arguing that the evidence was irrelevant, and that any probative value was substantially outweighed by its prejudicial effect. *See* Utah R. Evid. 401 (defining relevant evidence); *id.* R. 402 (governing the admissibility of relevant evidence); *id.* R. 403 (stating that even if relevant, the court may exclude "evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"); *see also State v. Beverly*, 2018 UT 60, ¶ 69, 435 P.3d 160 (stating that the balancing test of rule 403 may exclude evidence that is otherwise admissible and offered for a legitimate purpose under a different rule). However, "even if we were to conclude that the evidence here was improperly admitted, that would not decide the issue. We still would have to determine whether the error was harmful." *See State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992). We will not overturn a jury verdict "if the admission of the evidence did not reasonably affect the likelihood of a different verdict." *State v. Johnson*, 2007 UT App 184, ¶ 34, 163 P.3d 695 (quotation simplified). To prevail on appeal, an appellant has the burden to show that erroneously admitted evidence was prejudicial. *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987) ("For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict."); *see also C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 18, 977 P.2d 479 ("Harmless errors are those that are sufficiently inconsequential so no reasonable likelihood exists that the error affected the outcome of the proceedings." (quotation simplified)). In determining whether an error was prejudicial, we consider a host of factors, including

whether the evidence was cumulative, whether there was corroborating or contradictory evidence, and "the overall strength of the prosecution's case." *State v. Hackford*, 737 P.2d 200, 205 (Utah 1987) (quotation simplified). The more evidence supporting the verdict, the less likely any erroneous admission of evidence was harmful. *Hamilton*, 827 P.2d at 240.

¶21 At trial, the State argued that the evidence of the unfired bullet was admissible because it implied that someone carrying such a bullet had access to and might be comfortable with firearms and therefore would be more likely to use a firearm. The State also argued that the bullet linked Bowden to the stolen truck. Bowden contends that because the evidence presented to establish the shooter's identity was insufficient, the bullet invited the jury to speculate on circumstances not in evidence and conclude that the shooter was Bowden. Specifically, it allowed the jury to infer not only that Bowden had access to firearms in the stolen truck, but that he also had a personal interest in firearms. Further, he contends, the admission of the .45 caliber bullet "invited the jury to speculate . . . that Bowden possessed a 9 mm gun and shot at Tsouras." Bowden concludes that evidence of the unfired bullet on his person "may have diverted the jury's attention from the lack of evidence otherwise connecting Bowden to the shooting," which "unreasonably affected the likelihood of a guilty verdict." (Quotation simplified.) We are not persuaded.

¶22 While the bullet found in Bowden's pocket had a low probative value, it also provided little risk of unfair prejudice. Thus, there was not a reasonable likelihood of a more favorable outcome had the unfired bullet been excluded. Both purposes the State offered for the bullet's admission—to show that Bowden was comfortable with firearms and that he was connected to the stolen truck—were supported by other and better evidence. Bowden stipulated to his involvement with the stolen truck. Stolen along with the truck were "six or seven" firearms. Fifteen guns were found in the truck that Bowden was driving the night of the shooting, allowing the jury to infer that

Bowden had otherwise acquired eight or nine additional firearms. Also found in the truck were gun parts and bullets of various calibers. To the extent that the jury was influenced by the argument that Bowden was comfortable with firearms, the jury could have reasonably inferred that from other evidence given the number of firearms, accessories, and ammunition that Bowden possessed. Additionally, the stronger evidence that Bowden possessed a 9mm handgun and shot Tsouras is not the unfired .45 caliber bullet in his pocket but the 9mm bullet of the same brand used to shoot Tsouras that was located in the stolen truck to which Bowden stipulated to being connected. Under the circumstances, we determine that Bowden was not prejudiced by the admission of evidence that he had an unfired bullet in his pocket at the time that he was arrested.[4]

## III. Merger

¶23 Finally, Bowden contends that the trial court erred by not merging his four remaining convictions of felony discharge of a firearm with his conviction for attempted aggravated murder. The merger doctrine operates "to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Smith*, 2005 UT 57, ¶ 7, 122 P.3d 615 (quotation simplified). The motivation "behind the merger doctrine is to prevent violations of constitutional double jeopardy protection." *Id.*

¶24 Utah's "merger statute contains two merger tests." *State v. Corona*, 2018 UT App 154, ¶ 44, 436 P.3d 174 (quotation simplified). The first dictates that "when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under

---

4. "We do not determine whether the evidence was admitted improperly, because we conclude that any error in its admission was harmless." *See State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992).

different provisions of this code, the act shall be punishable under only one such provision." Utah Code Ann. § 76-1-402(1) (LexisNexis 2017). The second dictates that when an offense is a lesser included offense of another charged offense, a defendant may not be convicted of both offenses. *Id.* § 76-1-402(3). Bowden initially asserted that his discharge-of-a-firearm convictions should merge with his attempted aggravated murder conviction pursuant to both merger tests. However, after Bowden submitted his briefing in this case, this court issued a decision in *State v. Corona*, 2018 UT App 154, 436 P.3d 174, holding that "felony discharge of a firearm is not an included offense to aggravated murder." *Id.* ¶ 48. Bowden acknowledges that *Corona* forecloses his lesser included offense merger argument. We therefore need consider only whether Bowden's convictions merge under the first test, that is, whether they were part of "the same act . . . under a single criminal episode." *See* Utah Code Ann. § 76-1-402(1).

¶25 The State does not contest Bowden's assertion that his convictions are subject to merger under the "same act" provision of the merger statute.[5] The State asserts only that the plain language of the aggravated murder statute—notwithstanding the language of the merger statute—expressly precludes the offense of felony discharge of a firearm from merging with the crime of aggravated murder. *See State v. Bond*, 2015 UT 88, ¶ 70, 361 P.3d 104 (explaining that the legislature can preclude operation of the merger doctrine to particular criminal conduct if it does so explicitly). Utah's aggravated murder statute provides that "[a]ny aggravating circumstance described in Subsection (1)

---

5. Because the State does not contest Bowden's argument that his convictions are subject to merger pursuant to Utah Code section 76-1-402(1), we accept, for purposes of this decision, Bowden's premise that his firing the gun was the "same act," *see* Utah Code Ann. § 76-1-402(1) (LexisNexis 2017), as the "conduct constituting a substantial step toward," committing aggravated murder, *see id.* § 76-4-101(1).

or (2) that constitutes a separate offense does not merge with the crime of aggravated murder." Utah Code Ann. § 76-5-202(5)(a) (LexisNexis 2017). The list of aggravating circumstances includes circumstances in which "the actor *was previously convicted of . . .* felony discharge of a firearm." *Id.* § 76-5-202(1)(j)(xvii) (emphasis added). But it does not list the offense of felony discharge of a firearm itself—committed contemporaneously with the murder—as an aggravating circumstance. "The legislature exempts a statute from the requirements of the merger doctrine only when an explicit indication of legislative intent is present in the specific offense statute." *Bond*, 2015 UT 88, ¶ 70 (quotation simplified). Because the separate offense of felony discharge of a firearm is not included in the list of aggravating circumstances, there is no explicit indication of legislative intent to specifically exempt that offense from the merger doctrine in the aggravated murder context.[6] Because the aggravated murder statute does not preclude merger of a felony discharge-of-a-firearm conviction with an attempted aggravated murder conviction, and the State has not argued that the merger statute is otherwise inapplicable, we agree with Bowden that the trial court should have merged his convictions.

---

6. We note that this result may appear inconsistent with the result in *State v. Martinez*, 2019 UT App 166. However, *Martinez* involved attempted *murder*, not attempted *aggravated murder*, *id.* ¶ 19, and murder and aggravated murder are governed by separate sections of the Utah Code, *compare* Utah Code Ann. § 76-5-203 (LexisNexis 2017), *with id.* § 76-5-202. Without mentioning anything about previous convictions, the statute governing murder explicitly states that felony discharge of a firearm is a "predicate offense" that "does not merge with the crime of murder." *See id.* § 76-5-203(1)(v), (5)(a). To the contrary, the aggravated murder statute does not include contemporaneously committed felony discharge of a firearm in the list of aggravating circumstances that do not merge with aggravated murder. *See id.* § 76-5-202.

CONCLUSION

¶26    We determine that the evidence presented at trial was sufficient for the jury to find Bowden guilty of attempted aggravated murder and obstructing justice. We also determine that the admission of the evidence of the unfired bullet found in Bowden's pocket at the time of his arrest, even if improper, did not reasonably affect the likelihood of a different verdict. However, we reject the only argument the State makes in support of the trial court's merger ruling and therefore conclude that Bowden's felony discharge-of-a-firearm convictions should be merged with his attempted aggravated murder conviction. Accordingly, we vacate Bowden's four remaining convictions for felony discharge and remand for resentencing.

───────────

HARRIS, Judge (concurring):

¶27    I concur in full with the lead opinion's analysis. I write separately to more expressly discuss why the outcome of this case differs from the outcome of *State v. Martinez*, 2019 UT App 166, also issued today. In this case, we hold that a defendant who commits *aggravated* murder through discharge of a firearm may be—depending on the facts—entitled to have his convictions for felony discharge of a firearm merged into his conviction for aggravated murder. By contrast, in *Martinez*, we hold that a defendant who commits *non-aggravated* murder through use of a firearm is not entitled to have his convictions for felony discharge of a firearm merged into his conviction for murder.

¶28    These seemingly-disparate outcomes are dictated by the very different language our legislature chose to employ in the two statutes. In the aggravated murder statute, our legislature created an exception to the usual merger rules only where an "aggravating circumstance . . . constitutes a separate offense," and the legislature specified that felony discharge of a firearm

constitutes an "aggravating circumstance" only when the defendant was "previously convicted" of felony discharge. *See* Utah Code Ann. § 76-5-202(1)(j)(xvii), (5)(a), (5)(b) (Lexis Nexis 2017). By contrast, our legislature created a broader exception to the usual merger rules in the non-aggravated murder statute, mandating that "[a]ny predicate offense" described in the statute "that constitutes a separate offense does not merge with the crime of murder," and specifying that felony discharge of a firearm is a "predicate offense" described in the statute. *See id.* § 76-5-203(1)(v), (5)(a), (5)(b).

¶29    The result of our holdings in these two cases may seem counterintuitive. Defendants charged with both aggravated murder and felony discharge of a firearm will find it easier to obtain rulings merging felony discharge convictions into their murder convictions than will defendants charged with both non-aggravated murder and felony discharge of a firearm. Indeed, after reviewing our holdings here, prosecutors may reasonably conclude that—depending on the facts of the case, including how many counts of felony discharge of a firearm are at issue—it may ultimately be more punitive to charge a defendant with non-aggravated murder than with aggravated murder.

¶30    Although I fully agree with the lead opinions' conclusions that the plain language of the statutory text dictates these outcomes, I wonder whether the legislature truly intended this result. In the event that it did not, the legislature may wish to consider amending these statutes in a future legislative session.

_____