2020 UT App 31

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID BRYCE JONES,
Appellant.

Opinion
No. 20170815-CA
Filed February 27, 2020

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 151912839

Deborah L. Bulkeley, Attorney for Appellant

Sean D. Reyes, Nathan D. Anderson, and
David A. Simpson, Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HAGEN, Judge:

¶1 After gaining power of attorney over his elderly father, David Bryce Jones "loaned" himself the entirety of his father's retirement income to pay expenses for two failed restaurants and to cover his own personal expenses. At the same time, he neglected to pay for any of his father's basic living expenses, causing his father to become a ward of the State. A jury convicted Jones of abuse, neglect, or exploitation of a vulnerable adult and of unlawful dealing with property by a fiduciary. On appeal, Jones argues that he received ineffective assistance of counsel, that Utah's abuse of a vulnerable adult statute is unconstitutionally vague, and that there was insufficient evidence of intent to convict him of intentional conduct. We disagree with each of these contentions and affirm.

## BACKGROUND[1]

*Jones's Exploitation of His Father*

¶2    After turning eighty-six years old in 2010, Jones's father granted Jones power of attorney, meaning that Jones obtained control over his father's finances and healthcare-related decisions. Within two to three years, Jones knew that his father suffered from "progressive dementia" and was "arguably . . . incompetent."

¶3    In 2013, Jones opened a restaurant called Brewhaha. According to Jones, he and his father were "partners" in the Brewhaha venture. Jones found a property to lease for the restaurant, but the required lease had "harsh provisions" and Jones thought that the landlord was a "horrible person." Despite concerns about the lease, the landlord, and his father's incompetence, Jones not only signed the lease but also had his father sign as a co-tenant and personal guarantor.

¶4    Six months after signing the lease, Jones's father became dehydrated and needed to be hospitalized. Due to this incident, Jones arranged for his father to move to an apartment at an assisted living facility (the facility). On the facility's admission paperwork, Jones noted that his father suffered from "progressive dementia" and agreed to pay $3,000 per month for his father's rent and care. The cost of rent did not include personal expenses such as medications, haircuts, toothpaste, or other personal hygiene items.

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Ramirez*, 2019 UT App 196, n.2, 355 P.3d 1082 (cleaned up).

¶5    Three weeks after placing his father in the facility, Jones had his father sign a document authorizing Jones to loan himself money from his father's retirement income (the loan document). Jones's father received $6,500 per month in retirement income, and the loan document placed "no limit" on how much Jones could loan himself from that amount, so long as his father's physical and medical needs were met.

¶6    Relying on the authority of the loan document, Jones began loaning himself the entirety of his father's retirement income. He used this money to cover Brewhaha's renovation and operation costs. Also, because Jones did not have any income of his own, he lent himself money to pay for his living expenses. In return for fronting all of Brewhaha's and Jones's expenses, Jones's father received no ownership interest in the restaurant and was left with insufficient funds to cover his basic expenses and care.

¶7    Because Jones was using all his father's funds for his own business and personal expenses, he stopped paying his father's rent at the facility. Further, Jones failed to pay for his father's prescription medications or basic hygiene items like a toothbrush, a haircut, or bed pads. The facility sent monthly bills and statements to Jones requesting payment for his father's rent and care. The staff also called, left voicemails, and spoke with Jones in person about the need to pay for his father's care. Despite these efforts and Jones's promises to pay, the facility could not obtain the necessary payments and issued an eviction notice to Jones requiring him to either pay the overdue balance or have his father vacate the apartment within thirty days. Jones ignored the notice, missed two more payments, and failed to move his father out of the apartment.

¶8    Around the same time that the eviction notice was issued, Brewhaha's landlord filed suit against Jones and his father because Brewhaha was more than $10,000 behind in rent and

Jones had ignored the landlord's request to vacate the property. Jones filed a pro se motion to dismiss his father as a party, arguing that his father had suffered from "progressive dementia" since 2012 and "was not competent to sign either the lease or the personal guarantee." "Due to his condition," Jones said, his father had "no knowledge or comprehension of the eviction . . . and ha[d] no competence to participate in th[e] case." The lawsuit resulted in a six-figure judgment against Jones and signaled the end of Brewhaha as a viable business.

¶9     Undeterred by Brewhaha's failure, Jones opened another restaurant called Gusto. Jones again used his father's retirement income to fund Gusto's expenses. Jones's father was, again, not listed as an owner of the restaurant. And again, Gusto failed within months.

¶10     While this was happening, the father's younger brother learned about the eviction notice from the facility and became concerned that Jones might be misusing his father's funds. He reported his concerns to the facility, which in turn contacted Adult Protective Services (Protective Services). Protective Services opened an investigation into the matter.

¶11     Protective Services interviewed Jones's father as part of its investigation. At that interview, the father was unable to remember his age, birthday, siblings' names, where he had worked, where he had banked, how much money he made, or how to call 911. When the father took a phone call during the interview, he was unable to remember with whom he was speaking as soon as he hung up. And when the interviewers requested Jones's phone number, the father gave them a fingernail kit "as if a phone number was going to be in it."

¶12     Protective Services also spoke to Jones, who admitted that he had used his father's retirement income but insisted that he had his father's blessing to use "whatever money he wanted to try to run his restaurants." When confronted with the facility's

unpaid bills, Jones told Protective Services that he had an agreement with the facility whereby he could defer payments until his restaurants were turning a profit. Based on these conversations, Protective Services deduced that Jones's father had received $76,000 in retirement income during the relevant period, but Jones had made only $12,000 in payments to the facility. Jones's father had no balance in his bank account, indicating that Jones spent more than $60,000 either on the restaurants or himself.

¶13   As a result of Protective Services' investigation, the Office of Public Guardian (the Public Guardian) took over as the father's guardian, meaning that the Public Guardian wrested control of the father's finances and healthcare from Jones. From that point forward, the father's expenses at the facility were paid each month, and within a year, the Public Guardian paid off the entire amount that Jones had neglected to pay when he had power of attorney.

¶14   As Protective Services investigated and the Public Guardian took over, Jones continued to accrue expenses in his father's name. He opened a new credit card in his father's name. He transferred a $5,000 balance from an old credit card to the new card. Within three weeks of obtaining the new credit card, Jones racked up $14,000 in expenses that included charges to ski resorts, a dental office, the Division of Motor Vehicles, cable television, and gas stations. Jones later called the Public Guardian to inquire why it was not making payments on this new credit card.

¶15   Shortly after the Public Guardian took over, the father was administered the Montreal Cognitive Assessment (the MoCA test), a screening tool for dementia. As the nurse practitioner who administered the MoCA test entered the room, the father was standing, holding a phone, and listening to the dial tone. During the MoCA test, the father was unable to

identify a lion or rhinoceros, repeat sentences or simple one- or two-syllable words, perform basic math, or recognize letters in the alphabet. When the MoCA test was over, Jones's father received the lowest possible score.

¶16 Ten days after administration of the MoCA test, Jones sought to regain control of his father's finances. He drafted three documents (the financial control documents) and took them to his father to sign. The financial control documents directed that all the father's retirement income be deposited into Jones's personal accounts, authorized Jones to manage the retirement accounts and make loans to himself, and changed the accounts' contact information from the father's to Jones's. Each document concluded by stating that the father did not "recognize the authority of any person, institution, or Agency that attempts to change these directions." At a Protective Services hearing a month later, Jones testified that his father was "cogent" when he signed the financial control documents and "definitely [had] the capacity on a day-to-day basis to make decisions about who controls his finance[s] and where his money goes."

¶17 Jones eventually filed for personal bankruptcy, in which all the "loans" he made to himself from his father's retirement income were discharged.

*Legal Proceedings*

¶18 Based on the foregoing facts, the State charged Jones with exploitation of a vulnerable adult and with unlawful dealing with property by a fiduciary.

¶19 Before trial, Jones's attorney (trial counsel) moved to have the exploitation of a vulnerable adult charge dismissed on the basis that the exploitation statute was unconstitutionally vague. The district court deferred ruling on that motion until after trial, at which point it ruled that the statute was constitutional as applied to Jones "under the facts and circumstances of this case."

¶20    In a separate pretrial motion, trial counsel moved to exclude evidence that Jones "used [his father's] credit cards" on the basis that such evidence was subject to rule 404(b) of the Utah Rules of Evidence and that the State had not provided Jones notice of its intent to admit that evidence at trial. In ruling on the matter, the district court said the following:

> Anything that was not turned over in discovery is not going to be admissible . . . . If it's relevant to what's charged in the information, then it's admissible. If it is . . . evidence of other bad acts outside the scope of what's charged in the information, then I will hear an argument that it's not admissible because you didn't give the 404(b) notice that you were required to do because the defense asked for it and they were entitled to it.

Afterward, at trial, the State presented two pieces of evidence that Jones now argues were improperly admitted under the district court's rule 404(b) ruling: (1) evidence concerning the Brewhaha lease, and (2) a ledger sheet entitled "Loans to David Bryce Jones" that memorialized loans made from 1998 to 2000 but no payments (the ledger).

¶21    Also at trial, the State called one expert witness for whom it had provided notice—a nurse practitioner. The State also called two lay witnesses—the facility's general manager (the manager) and a Protective Services investigator (the investigator)—who were not designated as experts. The expert nurse practitioner had visited Jones's father at the facility on numerous occasions and was the same individual who administered the MoCA test to the father. She testified that Jones's father received the lowest possible score on the MoCA test and that, on his best day, may have scored two or three points out of a possible thirty. She also testified that Jones's father would have been unable to read or understand the

financial control documents at the time that he signed them and that his memory was such that he would remember signing the documents only for "[m]aybe five minutes."

¶22   The manager testified about his interactions with Jones's father at the facility. He testified that the father was unable to effectively communicate with others from the beginning of his time at the facility. For example, the father was unable to communicate to staff that he lost his wallet and could not understand most questions beyond basic pleasantries. The manager also said that the father was unable to take care of his own basic needs, such as feeding himself and personal grooming, without cues from others. He also testified that the father could not make his own decisions "without direction from other people." On direct examination, the State asked the manager, "Based upon your psychiatry degree,[2] based upon your daily interaction with [Jones's father], do you have an opinion whether or not he could read [the loan document] and comprehend it?" The manager responded, "[A]s I know [Jones's father] and the complexity of what is written [in the loan document], I would say that it would be very difficult for him to understand what . . . he would be signing."

¶23   The investigator, who had a bachelor's degree in gerontology and a master's degree in social work, also testified to the father's mental capacity. She was the individual who first interviewed Jones's father after Protective Services opened its investigation, about ten months after the signing of the loan document. *See supra* ¶ 11. Based on her observations during that interview, she opined that Jones's father (1) suffered from

---

2. Although this error went uncorrected during direct examination, the manager did not have a degree in psychiatry. Rather, the manager had a bachelor's degree in psychology and a master's degree in counseling and psychology.

"significant memory impairment," (2) would have lacked capacity to sign the loan document, and (3) would have lacked capacity to sign the financial control documents four months after the interview.

¶24　At the close of the prosecution's case, trial counsel moved for a directed verdict based on insufficient evidence. The district court denied the motion.

¶25　The jury convicted Jones as charged. He now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶26　Jones first argues that trial counsel was ineffective for (1) not objecting to the State eliciting expert testimony from the manager and investigator even though the State did not provide notice or otherwise designate them as experts, (2) not objecting to the State's admission of the ledger and evidence concerning the Brewhaha lease, (3) stipulating to an allegedly erroneous jury instruction, and (4) not moving the district court to merge Jones's two convictions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Ramirez*, 2019 UT App 196, ¶ 13, 455 P.3d 1082 (cleaned up).

¶27　Jones next argues that the district court erred when it determined that the abuse of a vulnerable adult statute was not unconstitutionally vague on its face or as applied to him. "Whether a statute is unconstitutionally overbroad or vague is a question of law reviewed for correctness." *State v. Mattinson*, 2007 UT 7, ¶ 6, 152 P.3d 300 (cleaned up).

¶28　Lastly, Jones argues that the district court erred by denying his motion for directed verdict based on insufficient

evidence. On appeal, we review a district court's "ruling on a motion for directed verdict for correctness." *State v. Doyle*, 2018 UT App 239, ¶ 11, 437 P.3d 1266 (cleaned up).


## ANALYSIS

### I. Ineffective Assistance of Counsel Claims

¶29 To prevail on an ineffective assistance of counsel claim, a defendant must satisfy the two-part *Strickland* test. First, the defendant must establish that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, the defendant must show prejudice by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Because the defendant is required to satisfy both parts of the *Strickland* test, "it is not necessary for us to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (cleaned up).

### A. Failure to Object to Expert Testimony

¶30 Jones's first ineffective assistance of counsel claim centers on trial counsel's failure to object to the State asking for expert testimony from two lay witnesses: the manager and investigator. The State did not give notice to the defense that it intended to use either witness as an expert, and both witnesses were asked to offer expert opinions on the father's mental health and capacity. Therefore, Jones argues, trial counsel was obliged to object to the State's questions calling for expert testimony.

¶31 To determine whether trial counsel was ineffective for failing to object during the manager's and investigator's testimony, it is first necessary to discuss the differences between

lay opinion and expert testimony. Lay opinion testimony is described by rule 701 of the Utah Rules of Evidence:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶32    In contrast, "if testimony, opinion or otherwise, is based on scientific, technical, or other specialized knowledge, it is within the scope of rule 702 of the Utah Rules of Evidence and may not be admitted as lay fact testimony." *State v. Rothlisberger*, 2006 UT 49, ¶ 20, 147 P.3d 1176 (cleaned up). If a party "intends to call any expert to testify in a felony case at trial," then it must "give notice to the opposing party as soon as practicable but not less than 30 days before trial." Utah Code Ann. § 77-17-13(1)(a) (LexisNexis 2017). If a party fails to provide notice that it intends to call an expert witness, then "the opposing party shall, if necessary to prevent substantial prejudice, be entitled to a continuance of the trial . . . sufficient to allow preparation to meet the testimony." *Id.* § 77-17-13(4)(a). A court can impose more serious sanctions if it determines that noncompliance with the notice rule "is the result of bad faith," but the "remedy of exclusion of the expert's testimony will only apply if the court finds that a party deliberately violated" the notice rule. *Id.* § 77-17-13(4)(b).

¶33    With these differences in mind, we turn to the question of whether trial counsel was ineffective for failing to object to the State's questions eliciting opinion testimony from the manager and investigator even though the State had not provided the defense notice of its intent to use them as experts. Regarding the

manager, the State's question called for expert testimony because it asked him, "[b]ased on [his] psychiatry degree," whether Jones's father would have understood the loan document when he signed it. *See* Utah R. Evid. 702 (explaining that expert testimony may be based on "[s]cientific, technical, *or other specialized knowledge*" (emphasis added)).[3] Regarding the investigator, the State both requested and received expert testimony that could only have been based on her "scientific, technical, or otherwise specialized knowledge." *Id.* This is particularly true with regard to the investigator's testimony concerning the father's capacity to understand the loan document; she could not have formed an opinion "based on [her] perception," *see* Utah R. Evid. 701(a), because she never spoke to Jones's father until ten months after the signing. But although the State's questions to the manager and investigator were objectionable, Jones has not established that trial counsel's failure to object prejudiced his defense.

¶34　Before the manager and investigator testified, the State had already introduced evidence of the father's mental capacity through the expert testimony of the nurse practitioner. Jones

---

3. Although the State's question called for expert testimony, we note that the manager's response to the State's question—that it would be difficult for Jones's father to understand the loan document—was couched in terms of lay opinion testimony based on his perceptions of and interactions with Jones's father, not his specialized training and experience. He specifically began his answer not with reference to his formal training but by referring to his familiarity with Jones's father. It seems likely that any "average bystander" who had personally witnessed the father's inability to communicate or remember important events would be "able to provide the same testimony" that he would struggle to understand the loan document. *See State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176.

contends that the testimony from the manager and investigator prejudiced his defense because it improperly lent "credibility to the State's position that [Jones's father] lacked capacity due to progressive dementia." This argument is flawed in at least two respects.

¶35 First, the fact that the nurse practitioner, the State's designated expert, had already testified to the father's mental incapacity cuts against a finding of prejudice. If the challenged testimony had been the only evidence that Jones's father lacked the capacity to sign the loan document, it might have been highly prejudicial. Here, however, the testimony of both the manager and investigator is merely cumulative of other properly admitted evidence that goes to the same facts, including the nurse practitioner's testimony and the position taken by Jones himself in the Brewhaha eviction proceeding. And where testimony is merely cumulative, we are disinclined to find prejudice even when the testimony was improperly admitted. *See State v. Thomas*, 777 P.2d 445, 449–50 (Utah 1989) (declining to find prejudice where improper hearsay testimony was cumulative and unlikely to have changed the outcome of the trial); *State v. Collier*, 736 P.2d 231, 233 (Utah 1987) (declining to find prejudice where improper testimony "was only cumulative of the evidence and testimony" of other witnesses); *State v. Jackson*, 2010 UT App 328, ¶ 17, 243 P.3d 902 (declining to find prejudice where "the alleged hearsay evidence was cumulative because it reiterated the essence of testimony presented by the victims or other eyewitnesses"), *overruled on other grounds by State v. DeJesus*, 2017 UT 22, 395 P.3d 111.

¶36 Second, and perhaps more importantly, even if trial counsel had objected to the State's questioning of the manager and investigator, it is unlikely that the testimony of either witness would have been excluded. Both witnesses had advanced degrees relevant to the subject matter to which they testified, and so would likely have qualified as expert witnesses.

*See* Utah R. Evid. 702(a) (stating that a witness can qualify as an expert "by knowledge, skill, experience, training, *or education*" (emphasis added)). And, absent bad faith, the statutory remedy for eliciting expert testimony without prior notice is a continuance, not exclusion of the expert testimony. Utah Code Ann. § 77-17-13(4)(a). Jones could only hope to exclude the testimony if he showed that the State "deliberately violated" the notice rule, *id.* § 77-17-13(4)(b), and Jones points to no evidence of deliberate impropriety on the part of the State. Therefore, even if trial counsel had objected to the lack of notice, the best that Jones could have hoped for was a continuance, and he has not argued how such a continuance would have affected the outcome of his trial.

¶37    For the foregoing reasons, Jones has not established that he was prejudiced by trial counsel's failure to object during the testimony of the manager and investigator.

B.    Failure to Object to Rule 404(b) Evidence

¶38    Jones's second ineffective assistance of counsel claim centers on trial counsel's failure to object to two pieces of evidence that Jones believes should have been excluded under the district court's rule 404(b) ruling: (1) evidence concerning the Brewhaha lease, and (2) the ledger. *See supra* ¶ 20. We address each argument in turn.

¶39    Jones argues that the evidence that Jones had his father sign the Brewhaha lease despite knowing about his father's infirmity constituted evidence of a "crime, wrong, or other act," *see* Utah R. Evid. 404(b)(1), to show that Jones "was dishonest and to generally show his bad character." However, rule 404(b) applies only "to evidence that is *extrinsic* to the crime charged." *State v. Lucero*, 2014 UT 15, ¶ 14 n.7, 328 P.3d 841 (cleaned up), *overruled on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Where "the evidence of prior acts is inextricably intertwined with the crime that is charged, or if both

the charged crime and the prior act are considered part of a single criminal episode, then rule 404(b) [does] not apply." *Id.* (cleaned up).

¶40   Here, evidence concerning the Brewhaha lease was not evidence of some prior act used to prove Jones's general bad character. Rather, it was offered as direct evidence of one of the crimes for which Jones was charged: exploitation of a vulnerable adult. Under the applicable Utah statute, a vulnerable adult is "an elder adult" or any adult "who has a mental or physical impairment which substantially affects that person's ability" to perform a number of basic tasks. Utah Code Ann. § 76-5-111(1)(s) (LexisNexis 2012). And a person is guilty of exploitation of a vulnerable adult if that person "unjustly or improperly uses or manages the resources of a vulnerable adult for the profit or advantage of someone other than the vulnerable adult." *Id.* § 76-5-111(4)(a)(iii). The evidence presented regarding the prior Brewhaha lawsuit included a statement in which Jones argued that his father was incompetent when he signed the Brewhaha lease. That admission supports the State's contention that Jones knew of his father's incapacity before pressuring his father to sign the loan and financial control documents, proving the mens rea for acts relevant to the exploitation of a vulnerable adult charge. Because this evidence was not extrinsic to the crime charged, trial counsel did not perform deficiently by not objecting to its admission because any objection would have been futile. *See State v. Karren*, 2018 UT App 226, ¶ 31, 438 P.3d 18 ("[T]he failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." (cleaned up)).

¶41   Jones next argues that the ledger was improper rule 404(b) evidence that "served only to portray [Jones] as having a propensity to not pay back his loans" because no payments were recorded on the ledger. But Jones's

defense theory at trial was that his father was a willing participant and partner in the Brewhaha and Gusto ventures. Therefore, trial counsel could have reasonably thought that the ledger supported Jones's defense theory inasmuch as it demonstrated that Jones's father willingly loaned Jones money well before any dementia clouded his judgment. Because there was a legitimate strategic reason for which trial counsel could have chosen not to object to the ledger's admission, counsel's failure to object cannot constitute deficient performance. *See State v. Vallejo*, 2019 UT 38, ¶ 70, 449 P.3d 39 (finding no deficient performance where counsel did not object to alleged hearsay because the testimony supported the defendant's strategy).

¶42 Accordingly, Jones has not shown that trial counsel performed deficiently by not objecting to evidence of the Brewhaha lease or the ledger.

C. Stipulation to an Erroneous Jury Instruction

¶43 Jones's third ineffective assistance of counsel claim centers on trial counsel's stipulation to an allegedly erroneous jury instruction regarding the mens rea requirement necessary to convict him of unlawful dealing with property by a fiduciary. The jury instruction stated that to find Jones guilty of that crime, the jury must find

1. That the defendant, David Bryce Jones,

2. Acting intentionally, knowingly, or recklessly with respect to each and every one of the following elements;

3. Dealt with property that had been entrusted to him as a fiduciary, in a manner which the defendant knew (beyond just recklessness) was a violation of the defendant's duty;

4. Which involved substantial risk of loss or detriment to the owner or to a person for whose benefit the property was entrusted; and

5. That the total value of the property is equal to or exceeds $5,000.

Jones contends that the jury instruction erroneously applied the mens rea requirement of knowledge to the "violation of the person's duty" element but not to the "involves substantial risk of loss" element. According to Jones, the instruction improperly lowered the State's burden of proof because it allowed the jury to convict if it believed Jones was merely reckless as to the involvement of a "substantial risk of loss." Thus, Jones contends that trial counsel performed deficiently by stipulating to the instruction.

¶44 But "the proper measure of attorney performance [is] simply reasonableness under prevailing professional norms," *State v. Silva*, 2019 UT 36, ¶ 20 (cleaned up), and Jones has not demonstrated that trial counsel unreasonably read or interpreted the law by stipulating to the challenged jury instruction. We conclude that Jones's reading of the statute—that the knowing mens rea requirement applies to the substantial-risk-of-loss element—is not dictated by its plain language and that Utah caselaw does not settle the question. Therefore, trial counsel was not deficient in stipulating to the jury instruction.

¶45 First, Jones's interpretation of Utah Code section 76-6-513(2) is not dictated by the plain language of the statute. In Utah, a person is guilty of unlawfully dealing with property by a fiduciary if:

the person deals with property that has been entrusted to him as a fiduciary, or property of a governmental entity, public money, or of a financial institution, in a manner which the person

knows is a violation of the person's duty and which involves substantial risk of loss or detriment to the owner or to a person for whose benefit the property was entrusted.

Utah Code Ann. § 76-6-513(2) (LexisNexis 2012). The relevant question is whether the modifier "knows" applies only to the violation-of-the-person's-duty element or also applies to the substantial-risk-of-loss element.

¶46 Based on the statute's syntax, competent defense attorneys could reasonably conclude that the knowing mens rea requirement applies only to the violation-of-the-person's-duty element. The series-qualifier canon of statutory interpretation provides that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012). For example, if the statute required proof that the person dealt with property "in a manner which the person knows is a violation of the person's duty and involves substantial risk of loss," the qualifier "knows" would presumably apply to both elements: the person must know that those dealings are a violation of the person's duty and the person must know that those dealings involve a substantial risk of loss. But "[t]he typical way in which syntax would suggest no carryover modification is that a determiner (*a*, *the*, *some*, etc.) will be repeated before the second element." *Id.* at 148.[4] Here,

---

4. For example, in the phrase, "*A solid wall or fence*," "solid" acts as a modifier that applies to both "wall" and "fence"—both must be solid. However, in the phrase, "*A solid wall or a fence*," the "a" is a determiner suggesting that the modifier does not apply to "fence"—only the wall need be solid. *See* Antonin Scalia & Bryan

(continued…)

the legislature inserted a determiner, "which," before the substantial-risk-of-loss element, suggesting that the "knows" modifier does not apply to that element. In other words, the statute appears to require that the person deal with property "in a manner [1] which the person knows is a violation of the person's duty and [2] which involves substantial risk of loss." Where the statute does not specify a mens rea for a particular element, recklessness is sufficient to establish criminal responsibility. Utah Code Ann. § 76-2-102. Therefore, based on a fair reading of the statute, trial counsel could reasonably conclude that the jury instructions accurately reflected the applicable mental states for each element.[5]

¶47    Second, such a conclusion is particularly reasonable given that no Utah appellate court has squarely addressed whether a knowledge or recklessness mens rea requirement applies to the substantial-risk-of-loss element. We recognize that defense attorneys are not "categorically excused from failure to raise an argument not supported by existing legal precedent." *Silva*, 2019 UT 36, ¶ 19. But without such legal precedent and without a clear basis in the statutory language, trial counsel's stipulation to the jury instruction did not fall below an objective standard of

_____

(…continued)
A. Garner, Reading Law: The Interpretation of Legal Texts 148–49 (2012).

5. Jones's "challenge to the jury instruction[] is viewed through the lens of ineffective assistance of counsel, and thus we need not definitively resolve what the statute actually means." *See State v. Squires*, 2019 UT App 113, ¶ 32 n.7, 446 P.3d 581. We decide only that trial counsel was not deficient in stipulating to the jury instruction because knowledge is not plainly required as to the substantial-risk-of-loss element.

reasonableness. *See Squires*, 2019 UT App 113, ¶¶ 30–36 (concluding that failure to object to allegedly incorrect jury instructions was not deficient performance where statutory language did not require a particular interpretation and the issue was unsettled under Utah caselaw); c*f. State v. Eyre*, 2019 UT App 162, ¶¶ 31–32, 452 P.3d 1197 (concluding that failure to object was not deficient performance where Utah courts had not addressed an issue and outside authorities reached conclusions unfavorable to the defendant's argument); *State v. Brocksmith*, 2018 UT App 76, ¶¶ 16–17, 424 P.3d 1122 (holding that counsel is not ineffective for failing to raise a "truly novel" constitutional challenge when the law at issue "is not clearly unconstitutional").

¶48    Accordingly, Jones has failed to establish deficient performance because reasonable counsel could interpret Utah Code section 76-6-513(2) in a manner consistent with the jury instruction.

D.    Failure to Move for Merger of Jones's Convictions

¶49    Jones's fourth and final ineffective assistance of counsel claim centers on trial counsel's failure to move for merger of his convictions for exploitation of a vulnerable adult and for unlawful dealing with property by a fiduciary. "The merger doctrine operates to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Bowden*, 2019 UT App 167, ¶ 23, 452 P.3d 503 (cleaned up). "The motivation behind the merger doctrine is to prevent violations of constitutional double jeopardy protection." *Id.* (cleaned up).

¶50    A defendant is entitled to merger of his or her offenses if they can satisfy one of two statutorily defined merger tests:

> The first dictates that when the same act of a defendant under a single criminal episode shall

establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision. The second dictates that when an offense is a lesser included offense of another charged offense, a defendant may not be convicted of both offenses.

*Id.* ¶ 24 (cleaned up); *see also* Utah Code Ann. § 76-1-402(1), (3) (LexisNexis 2012). Jones argues that he was entitled to merger of his convictions under either test.

¶51 Regarding the first test, Jones contends that "although the two statutes under which [Jones] was convicted are typically separate offenses, the State's theory of the case provided no factual distinction between the two charges." This is incorrect. The two counts against Jones were not based on "the same act of a defendant," *see id.* § 76-1-402(1), because the charges concern, at least in part, different time periods. The charge for unlawful dealing with property by a fiduciary could relate only to Jones's actions before the Public Guardian relieved Jones of his fiduciary powers—i.e., having his father sign the loan document and loaning himself all his father's monthly retirement income. The charge for exploitation of a vulnerable adult, however, is based in part on Jones's conduct after the Public Guardian was appointed and relieved Jones of his fiduciary powers—i.e., having his father sign the financial control documents and racking up charges on a new credit card that he opened in his father's name. Therefore, because separate criminal acts support each charge, Jones's argument under the first merger test fails.

¶52 Regarding the second test, Jones argues that "[a]lthough the State charged [Jones] with violating both statutes, the elements overlap, particularly under the only theory advanced by the State—that [Jones] purportedly used his fiduciary

position to use his father's money for a purpose other than caring for his father." Whether the "greater-lesser relationship" required by the second test applies is "determined by comparing the statutory elements of the crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial." *State v. Hill*, 674 P.2d 96, 97 (Utah 1983). Here, the elements of the offenses do not overlap. The exploitation charge required a showing that Jones's father was a vulnerable adult, which is not required by the unlawful dealing with property by a fiduciary statute. And the unlawful dealing with property by a fiduciary charge required a showing that Jones was a fiduciary, which is not required by the exploitation of a vulnerable adult statute. *Compare* Utah Code Ann. § 76-5-111(4)(a)(iii), *with id.* § 76-6-513(2). Further, as discussed above, *supra* ¶ 51, different facts were presented at trial to support both charges. Therefore, Jones's argument under the second merger test fails as well.

¶53 Because neither test applies to this case, trial counsel did not perform deficiently by not moving the district court to merge Jones's convictions. *See State v. Farnworth*, 2018 UT App 23, ¶ 53, 414 P.3d 1053 (finding no deficient performance for failure to move for merger because "such a motion would have been futile").[6]

---

6. Jones also makes a cumulative error argument under the umbrella of ineffective assistance of counsel. However, "under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had. If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *State v. Alfatlawi*, 2006 UT App 511, ¶ 52, 153 P.3d 804 (cleaned up). Here, Jones has not established that any errors occurred or

(continued…)

## II. Vagueness Challenge

¶54    Jones contends that Utah Code section 76-5-111, the exploitation of a vulnerable adult statute, is unconstitutionally vague on its face and as applied to his conduct. In relevant part, the statute provides:

> A person commits the offense of exploitation of a vulnerable adult when the person . . . unjustly or improperly uses or manages the resources of a vulnerable adult for the profit or advantage of someone other than the vulnerable adult.

Utah Code Ann. § 76-5-111(4)(a)(iii) (LexisNexis 2012). Jones argues that the "unjustly or improperly" language is unconstitutionally vague because those are "subjective terms, which . . . could lead to charges against virtually anyone who uses a vulnerable adult's resources for the use of anyone other than the vulnerable adult." We disagree.

¶55    "The United States Supreme Court has explained that vagueness challenges to 'statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" *State v. Jones*, 2018 UT App 110, ¶ 15, 427 P.3d 538 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). "It is well-established that a defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* ¶ 16 (cleaned up). "A court should therefore examine the defendant's conduct before analyzing other hypothetical applications of the law." *Id.* (cleaned up). "If the defendant's conduct is clearly prohibited,

---

(…continued)
that any of the alleged errors resulted in prejudice. Therefore, the cumulative error doctrine does not apply.

then he lacks standing to challenge the statute based on another's hypothetical conduct." *Id.*

¶56 Despite any vagueness inherent in the language of the exploitation of a vulnerable adult statute, Jones's conduct in this case was clearly proscribed. Although Jones offers examples of less egregious conduct that might arguably fall within the scope of the statute, this is not a case of "one child ask[ing] a vulnerable adult for help with paying college tuition or purchasing a home from a vulnerable adult where that child's sibling had received no such assistance." Rather, this is a case where a son "loaned" himself the entirety of his father's retirement income and neglected to pay for his father's basic living expenses until his father became a ward of the State. Jones's actions in this regard are "unjust" and "improper" under any definition of those terms.

¶57 Because Jones's conduct is clearly prohibited by law, "he lacks standing to assert a vagueness claim and we need not address the issue any further." *See id.* ¶ 17.

### III. Sufficiency of the Evidence

¶58 Jones's final argument is that there was insufficient evidence that he "knew he was breaching his duty or otherwise improperly or unjustly managing his father's finances." Evidence is sufficient when, viewed in the light most favorable to the State, there exists "some evidence . . . from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *See State v. Montoya*, 2004 UT 5, ¶ 9, 84 P.3d 1183 (cleaned up). We conclude that both convictions were supported by ample evidence.

¶59 Jones first challenges his conviction for exploitation of a vulnerable adult, arguing that insufficient evidence supported the jury's finding that he acted "intentionally or knowingly," Utah Code Ann. § 76-5-111(4)(b)(i) (LexisNexis 2012), when he

"unjustly or improperly use[d] or manage[d]" his father's resources for his own benefit, *see id.* § 76-5-111(4)(a)(iii). We disagree. The State produced evidence at trial that Jones knew his father was incompetent due to progressive dementia when Jones began using the father's income to fund Jones's business ventures. Other evidence showed that Jones took the entirety of his father's retirement income, leaving no funds from which his father's rent and other basic living expenses could be paid. Further, Jones undoubtedly became aware of the unjust or improper nature of his actions when the Public Guardian wrested away custody of his father, but Jones was undeterred and continued to incur expenses by opening a new credit card in his father's name. This is sufficient evidence from which the jury could conclude that Jones "intentionally or knowingly" used his father's resources in an unjust manner and for his own benefit.

¶60 Jones also challenges his conviction for unlawful dealing with property by a fiduciary. He argues that insufficient evidence supported the criminal statute's mens rea requirements for the violation-of-a-person's-duty and substantial-risk-of-loss elements. *See id.* § 76-6-513(2). First, Jones contends that there was insufficient evidence from which the jury could conclude that he knowingly violated his fiduciary duty. But there is ample evidence from which the jury could find that Jones knowingly breached his duty "to act primarily for the benefit of" his father. *See Robinson v. Robinson*, 2016 UT App 33, ¶ 43, 368 P.3d 105 (cleaned up). While Jones contends that his father was his "business partner," only Jones was listed as an owner of Brewhaha and Gusto. Thus, despite fronting all the expenses, his father had no ownership stake in either restaurant. Based on this evidence, the jury could reasonably conclude that Jones was using his father's income primarily to benefit himself, not his father. And a jury could also conclude that Jones knew he was violating his fiduciary duties when he failed to pay his father's rent even as his ailing father faced the threat of eviction. This

evidence is more than sufficient to support the jury's finding that Jones knowingly violated his fiduciary duties.

¶61 Sufficient evidence also supported the jury's finding with regard to the substantial-risk-of-loss element. As already discussed in connection with his ineffective assistance claim, *supra* ¶¶ 43–48, Jones argues that the unlawful dealing statute required the State to prove that the defendant knew that his conduct created a substantial risk of loss. But, as applied here, we see very little daylight between knowledge, i.e., the defendant being "aware that his conduct [was] reasonably certain to cause" a substantial risk of financial loss, and recklessness, i.e., the defendant being "aware of but consciously disregard[ing] a substantial and unjustifiable risk" of financial loss. *See generally* Utah Code Ann. § 76-2-103 (LexisNexis 2012) (defining "knowingly" and "recklessly"). Under either formulation, the evidence of Jones's conduct fully satisfied this element. While Jones still had fiduciary power, he had his father sign the Brewhaha lease as a co-tenant and guarantor despite being aware of the "harsh" and "unfair" terms of the lease. And even if Jones could argue reasonable ignorance of the risky nature of the Brewhaha investment, he was undoubtedly aware of the financial risks involved when he used his father's money to start Gusto in the immediate aftermath of Brewhaha's failure. This is sufficient evidence from which the jury could find that Jones was aware that his conduct entailed a substantial risk of loss to his father.

CONCLUSION

¶62 Jones's claims for ineffective assistance of counsel fail because he has not established deficient performance or prejudice with regard to any of trial counsel's challenged actions. Jones also has not established that Utah's exploitation of a vulnerable adult statute is vague as applied to his criminal

conduct. And we reject Jones's sufficiency of the evidence claim because the jury's findings were supported by ample evidence.

¶63    Affirmed.

_____